# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

UNIFYSCC, et al.,

              Plaintiffs,

   v.

SARA H. CODY, et al.,

              Defendants.

Case No.  22-cv-01019-BLF

**ORDER GRANTING IN PART AND
DENYING IN PART MOTION FOR
PRELIMINARY INJUNCTION**

[Re:  ECF No. 27]

In this case, Tom Davis, Maria Ramirez, and unincorporated association UnifySCC challenge Defendant Santa Clara County's requirement that its employees be vaccinated against COVID-19, a highly contagious and deadly disease that has claimed the lives of over 1 million Americans and over 6 million people worldwide in just over two years.  Plaintiffs allege that the County's vaccine mandate (which requires that County employees be COVID-19 vaccinated or obtain an exemption from the mandate as a condition of their employment) and its accommodations for those that obtain exemptions violate the First Amendment, Fourteenth Amendment, and California's Fair Employment and Housing Act.  *See* ECF No. 1 ("Compl.").

Now before the Court is Plaintiffs' motion for a preliminary injunction against the County's policy.  ECF No. 17 ("Mot."); *see also* ECF No. 32 ("Reply").  The County[1] opposes the motion.  ECF No. 31 ("Opp.").  The Court held a hearing on the motion on June 23, 2022.  *See* ECF No. 41.  For the following reasons, the Court finds that the vaccination mandate and most of the accommodations framework are likely to survive constitutional scrutiny, but that part of the

---

[1] The Court will refer to the Defendants collectively as the "County" throughout this Order.  The other named Defendants are Sara H. Cody (the County Public Health Officer), James Williams (the County Counsel), and Jeffrey Smith (the County Executive).

United States District Court
Northern District of California

County's accommodations program that prioritizes employees in high-risk roles with medical and disability exemptions over those with religious exemptions for placement into vacant County positions of lower risk likely does not.  Accordingly, the Court GRANTS IN PART and DENIES IN PART the motion for a preliminary injunction.

## I.   BACKGROUND

On August 5, 2021, "based on the strong recommendation of the Health Officer [Defendant Sara Cody], to stem the "significant rise of COVID-19 cases and hospitalizations among the unvaccinated due to the Delta variant," and "[t]o protect County personnel, the community members with whom County personnel interact, and all residents of the County," Defendant County Executive Jeffrey Smith and Defendant County Counsel James Williams issued a policy regarding COVID-19 vaccinations.  ECF No. 31-3 ("Marquez Decl.") Ex. 10 at Memorandum ("Aug. 5 Mem.").[2]  The Policy had two parts:  (1) a COVID-19 vaccine mandate, with limited exemptions; and (2) an accommodations framework for County personnel who received exemptions to the mandate.

### A.   Vaccine Mandate

First, the Policy mandated that all County personnel (including employees, interns, volunteers, and certain types of contractors) be fully vaccinated and boosted against COVID-19 (the "Mandate").  Aug. 5 Mem. at 1.  County personnel had to become at least partially vaccinated or submit a request for exemption by August 20, 2021, and become fully vaccinated by September 30, 2021.  *Id.* at 2.  The Mandate contained three "limited exemptions" that allowed County employees to request an exemption and "a reasonable accommodation to the vaccination requirement" if they had:

- "a contraindication recognized by the U.S. Centers for Disease Control and Prevention (CDC) or by the vaccine's manufacturer to *every* approved COVID-19 vaccine"—i.e., "a condition that makes vaccination inadvisable" (the "medical

---

[2] The Policy (and California and County public health orders from which the Policy takes direction) have been amended multiple times.  *See* Opp. at 5–6 (recounting amendments to the orders).  Plaintiffs do not allege that the modifications to the Policy are material to their claims, and so the Court does not discuss the modifications in detail in this order.

2

exemption");

- "a disability" that requires a "reasonable accommodation" (the "disability exemption"); or

- an "[o]bject[ion] to COVID-19 vaccination based on their sincerely-held religious belief, practice, or observance" (the "religious exemption").

*Id.* at 3.  Employees seeking exemptions were instructed to contact their department head to obtain a copy of one of two forms based on the type of exemption they were seeking:  (1) a "Medical Exemption and/or Disability Accommodation Request Form," or (2) a "Religious Accommodation Request Form."  *Id.*  The exemption request forms were submitted to the County's Equal Opportunity Division, which then informed employees and their departments if the exemptions were approved or denied.  *Id.*

As of late April 2022, the County had received more than 1,400 requests for exemptions from the Mandate.  Marquez Decl. ¶ 38.  As to the requests for religious exemptions, the County exercised minimal discretion in determining whether to grant the requests.  *Id.*  The County considered only whether the request "articulated a claimed religious belief on the face of the exemption request form," rather than some other belief, "such as a political objection or personal non-religious belief that vaccines are dangerous."  *Id.*

**B.      Accommodations for Exempt Employees**

Second, the Policy provided employees granted exemptions from the Mandate different accommodations based on a tiered system (the "Accommodations").  Based on guidance from the County Department of Public Health, each County department designated a position occupied by an employee seeking an exemption into one of three tiers based on the level of COVID-19 transmission risk presented by that position.  Marquez Decl. ¶ 36.  To determine the risk level of a position, departments considered factors such as the nature of contact the employee had with others; the risk posed to vulnerable populations that the County served; the risk posed to employees and others at serious risk of illness or death from COVID-19; the risk of a COVID-19 outbreak in the job setting; and the essential job functions that position entailed with or without accommodations.  *Id.*  The County also considered whether the facilities in which that employee

1    worked presented a high risk of infection, severe illness, or death given the type of facility (i.e.,

2    jails or homeless shelters) or the vulnerability of the population served in that facility (i.e., sick

3    patients in hospitals).  *Id.*  Positions were sorted into lower-, intermediate-, or high-risk tiers.  *Id.*

4          The risk tier determined what accommodations the County offered to employees.  Exempt

5    employees in lower-risk roles were permitted to wear a surgical mask and receive a COVID-19

6    test each week in lieu of vaccination.  Marquez Decl. ¶ 37.  Exempt employees in intermediate-

7    risk roles were permitted to wear an N95 mask and obtain two PCR COVID-19 tests per week in

8    lieu of vaccination.  *Id.*  "Based on the significant health and safety risks to and posed by

9    unvaccinated employees in high-risk roles," the County determined that it could not safely allow

10   exempt employees to remain in high-risk roles.[3]  *Id.*  The County thus offered those employees

11   leave (including option of using available leave banks) "during which the County would assist [the

12   employee] in seeking reassignment or transfer to a lower- or intermediate-risk position."  *Id.*

13         Beginning in mid-October 2021, the County notified exempt employees in high-risk roles

14   that the County could not accommodate them in their current positions and that they would be

15   placed on administrative leave (with permitted use of available leave banks) while the County

16   worked with them to determine if reassignments or transfers were possible.  Marquez Decl. ¶¶ 40–

17   41.  The County's Equal Opportunity Division and Employee Services Agency were enlisted to

18   help employees in this process.  Marquez Decl. ¶ 41.  Exempt employees with disability or

19   medical exemptions were told that they may be entitled to "priority consideration" for vacant

20   positions consistent with the Americans with Disabilities Act and the California Fair Employment

21   and Housing Act.  *Id.*

22         As of April 15, 2022, 138 exempt employees in high-risk roles remained on leave, about

23

---

[3] On January 10, 2022, the County Health Department established a limited waiver process that would allow a workplace subject to a vaccine mandate to permit unvaccinated individuals in higher-risk settings to work in those settings if their workplace was suffering from "critical staffing concerns" and "could not maintain operations" without them.  Marquez Decl. ¶ 50 & Ex. 11.  If approved, the waiver would require that the personnel subject to the waiver wear a fit-tested N95 (or greater) respirator at all times at work, obtain twice-weekly PCR or antigen tests, and not use breakrooms, cafeterias, or meal rooms indoors in shared air space when others were present.  *Id.* ¶ 50.  The County itself never applied for such a waiver for its own employees in any setting.  *Id.* ¶ 51.

30 of whom were on a leave unrelated to their unvaccinated status (such as family, medical, or other personal leave).  Marquez Decl. ¶ 39 & Ex. 11.  As of May 20, 2022, at least fifteen exempt employees in high-risk roles had been offered a lower- or intermediate-risk role as an accommodation.  ECF No. 35-2 ("Doyle Decl.") ¶ 3.  Thirteen of those employees received religious exemptions from the Mandate.  *Id.*

### C.    Plaintiffs

Plaintiffs in this lawsuit are UnifySCC, an unincorporated association of exempt County employees in high-risk job settings; and Tom Davis and Maria Ramirez, two County employees and members of UnifySCC.  Compl. ¶¶ 8–10.

Davis has been a heating, ventilation, and air conditioning/refrigeration ("HVAC/R") mechanic for the Building Operations division of the County's Facilities and Fleets Department ("FAF") since 2018.  ECF No. 31-2 ("Ortega Decl.") ¶ 4.  HVAC/R mechanics rotate on-call duties and need to respond to service requests at all hours in facilities across the County, including high-risk facilities such as the County's hospitals, clinics, and jails.  *Id.* ¶¶ 6–8.  Ramirez has been a registered nurse at Santa Clara Valley Medical Center ("SCVMC") since 2019.  ECF No. 31-5 ("Menzies Decl.") ¶ 9.  She works in a medical unit with other SCVMC staff on patients who are significantly ill and thus vulnerable to acquiring other infections such as COVID-19.  *Id.* ¶¶ 10–11, 14.  Ramirez's duties do not permit her to work remotely or in non-clinical settings.  *Id.* ¶ 9.

Both Davis and Ramirez requested and received religious exemptions from the Mandate.  Ortega Decl. ¶¶ 10–11 & Exs. 1–2 (Davis' exemption); Menzies Decl. ¶ 13 & Ex. 1 (Ramirez's exemption).  Their departments told both of them that because they were in high-risk roles, they could not be safely accommodated in their current positions.  Ortega Decl. ¶ 12; Menzies Decl. ¶¶ 14–16, 18–20 & Exs. 1, 3.  They were told that the County would try to accommodate them into a lower-risk position in their own departments or another County department, but that those options might be limited.  Ortega Decl. ¶¶ 13–14; Menzies Decl. ¶¶ 15–16.

Davis' position as an HVAC/R mechanic could not be limited to lower-risk facilities because of the high demands of 24/7 high-risk facilities, the lack of staffing to meet that demand, and equity considerations with non-exempt HVAC/R mechanics.  Ortega Decl. ¶ 15.  High-risk

United States District Court
Northern District of California

1    facilities like jails and hospitals amounted to 61% of work assignments for HVAC/R mechanics

2    since 2020, with Davis working 58% of his total hours in those facilities.  *Id.* ¶ 9.  HVAC/R

3    mechanics have expressed preferences to avoid working in those areas because of added burdens.

4    *Id.* ¶¶ 4–8.

5         Upon the invitation to apply for lower-risk positions, Ramirez refused.  Menzies Decl.

6    ¶ 17.  She told the County that "[a]pplying for open vacancies [within the County] is not an

7    adequate accommodation" and that she was asking to instead "wear a surgical mask and perform[]

8    symptom testing, in the same manner as [she had] been doing for the past almost 2 years."  *Id.* &

9    Ex. 3.  Ramirez never applied for or sought any low- or intermediate-risk positions in the County.

10    *Id.* ¶¶ 17–21.

11         **D.    This Lawsuit**

12         On February 18, 2022, Plaintiffs filed this lawsuit against the County, Sara H. Cody (the

13    County Public Health Officer), James Williams (the County Counsel), and Jeffrey Smith (the

14    County Executive).  *See* Compl.  Plaintiffs assert four claims:  (1) a claim under 42 U.S.C. § 1983

15    for violation of the Free Exercise Clause of the First Amendment, Compl. ¶¶ 47–54; (2) violation

16    of California's Fair Employment and Housing Act ("FEHA"), Cal. Gov't Code § 12940, Compl.

17    ¶¶ 55–60; (3) a § 1983 claim for violation of the Equal Protection Clause of the Fourteenth

18    Amendment, *id.* ¶¶ 61–67; and (4) a § 1983 claim pursuant to *Monell v. Dep't of Soc. Servs.*, 436

19    U.S. 658 (1978), Compl. ¶¶ 68–71.  Plaintiffs seek injunctive relief, damages, and attorneys' fees

20    and costs.  *Id.* at "Prayer for Relief".

21         On March 3, 2022, almost two weeks after filing the Complaint, Plaintiffs moved for a

22    temporary restraining order.  ECF No. 22.  The Court denied Plaintiffs' motion for a temporary

23    restraining order on the grounds that they waited "two days short of seven months after the

24    issuance of the [P]olicy" to seek the TRO.  *See UnifySCC v. Cody*, 2022 WL 686310, at *2 (N.D.

25    Cal. Mar. 8, 2022).  The Court also set a briefing schedule for Plaintiffs' motion for a preliminary

26    injunction.  *Id.*  The motion was timely filed, *see* Mot., and the Court held a hearing on June 23,

27    2022, *see* ECF No. 41.

28

## II.     LEGAL STANDARD

Preliminary injunctive relief, whether in the form of a temporary restraining order or a preliminary injunction, is an "extraordinary and drastic remedy" that is never awarded as of right. *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (internal citations omitted). "It is so well settled as not to require citation of authority that the usual function of a preliminary injunction is to preserve the status quo ante litem pending a determination of the action on the merits." *Tanner Motor Livery, Ltd. v. Avis, Inc.*, 316 F.2d 804, 808 (9th Cir. 1963).

A plaintiff seeking preliminary injunctive relief must establish "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Defense Council*, 555 U.S. 7, 20 (2008).  "[I]f a plaintiff can only show that there are serious questions going to the merits – a lesser showing than likelihood of success on the merits – then a preliminary injunction may still issue if the balance of hardships tips sharply in the plaintiff's favor, and the other two *Winter* factors are satisfied." *Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014) (internal quotation marks and citations omitted).

## III.     DISCUSSION

As an initial matter, the County argues that Plaintiffs' motion should be denied because it improperly relies on unverified allegations in the Complaint rather than competent evidence, such as declarations or authenticated exhibits.  Opp. at 8–9.  Plaintiffs respond that they attached relevant County orders, policies, and emails regarding the Accommodations process to their Complaint and that the County's own declarations and evidence confirm the allegations in the Complaint.  Reply at 2–3.  While the County is correct that a movant "has to demonstrate, not merely allege, his entitlement to a preliminary injunction," *Hicks v. Neal*, 2012 WL 3791399, at *3 (N.D. Cal. Aug. 31, 2012) (citing *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012)), the County does not dispute that the copies of the Policy attached the Complaint are genuine.  Additionally, the Court's analysis below relies on evidence the County has submitted in opposition to the motion, and the narrow portion of the Policy that the Court enjoins is a practice the County has admitted occurs.  Accordingly, the Court will not deny Plaintiffs' motion on this

1    ground.

2           With that threshold issue resolved, the Court now turns to merits of the *Winter* factors.

3           **A.    Likelihood of Success on the Merits**

4           The first *Winter* factor examines whether Plaintiffs are likely to succeed on the merits of

5    their claims.  The Court will analyze whether Plaintiffs are likely to succeed on their first § 1983

6    claim for violation of the Free Exercise Clause of the First Amendment.[4]

7           The Free Exercise Clause of the First Amendment states that "Congress shall make no law

8    . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  "[L]aws incidentally

9    burdening religion are ordinarily not subject to strict scrutiny under the Free Exercise Clause so

10   long as they are neutral and generally applicable."  *Fulton v. City of Phila., Penn.*, 141 S. Ct. 1868,

11   1976 (2021) (citing *Employment Div. v. Smith*, 494 U.S. 872, 878–82 (1990)); *see also Church of*

12   *the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531–34 (1993)).  If a rule is both neutral

13   and generally applicable, it is subject to rational basis review in which the government action must

14   be "rationally related to a legitimate governmental purpose."  *Stormans, Inc. v. Wiseman*, 794 F.3d

15   1064, 1084 (9th Cir. 2015); *accord Kane v. De Blasio*, 19 F.4th 152, 164 (2d Cir. 2021).  If a rule

16   is either non-neutral or not generally applicable, then it is subject to strict scrutiny and must be

17   "narrowly tailored" to serve a "compelling" state interest.  *Kennedy v. Bremerton Sch. Dist.*, ---

18   S. Ct. ----, 2022 WL 2295034, at *9 (U.S. Jun. 27, 2022) (citing *Lukumi*, 508 U.S. at 546); *Fulton*,

19   141 S. Ct. at 1881.

20          As a threshold matter, although Plaintiffs do not do so, the Court agrees with the County

21   that it must separately analyze two parts of the County's Policy:  (1) the Mandate, and (2) the

22   Accommodations.  This aligns with multiple circuit and district courts who have analyzed

23   COVID-19 vaccination policies with exemptions and accommodations in this manner.  *See, e.g.*,

24

25   ───────────────
     [4] Because Plaintiffs are not likely to succeed on the merits of their Free Exercise claim (except as
26   to the priority consideration portion of the County's Policy), Plaintiffs are similarly not likely to
     succeed on the merits of their Equal Protection claim either.  *See, e.g.*, *Mills II*, 16 F.4th at 35
27   ("When a free exercise challenge fails, any equal protection claims brought on the same grounds
     are subject only to rational-basis review."); *Prince v. Mass.*, 321 U.S. 158, 170 (1944) (Equal
28   Protection claim rose and fell with Free Exercise claim because "the one is but another phrasing of
     the other").  Plaintiffs do not seek relief under their FEHA or *Monell* claims in their motion.

United States District Court
Northern District of California

*Kane*, 19 F.4th at 164–69 (upholding vaccine mandate under rational basis review but enjoining accommodations procedures under strict scrutiny in Free Exercise challenge to New York City school employee COVID-19 vaccine order); *Does 1-6 v. Mills*, 16 F.4th 20, 29–35 (1st Cir. 2021) ("*Mills II*") (upholding vaccine mandate for Maine healthcare workers under rational basis review); *Ferrelli v. N.Y. Unified Ct. Sys.*, 2022 WL 673863, at *5–9 (N.D.N.Y. Mar. 7, 2022) (same, as to COVID-19 vaccine requirement for New York court employees); *cf. Wise v. Inslee*, 2021 WL 4951571, at *3 (E.D. Wa. Oct. 25, 2021) (disagreement with "the availability of accommodations" did not affect analysis of constitutionality of vaccine mandate or exemptions).

The Court now separately considers whether the Mandate and the Accommodations are neutral and generally applicable, and then applies the appropriate tier of scrutiny.

### i. Mandate

The Court first considers the Mandate, which requires that all County employees be fully vaccinated and boosted against COVID-19 or receive one of three limited exemptions. Aug. 5 Mem. at 1–3. The evidence submitted points more persuasively to finding that the Mandate is neutral and generally applicable and passes rational basis scrutiny.

#### a. Fulton *Analysis*

Under *Fulton*, law incidentally burdening religion is subject only to rational basis review as long as it is neutral and generally applicable. 141 S. Ct. at 1976; *Lukumi*, 508 U.S. at 531–34. The tests for "[n]eutrality and general applicability are interrelated," but the prongs are considered separately. *Stormans*, 794 F.3d at 1076 (quoting *Lukumi*, 508 U.S. at 531).

<u>Neutrality</u>. A policy must be both facially and operationally neutral to avoid strict scrutiny. "A law lacks facial neutrality if it refers to a religious practice without secular meaning discernable from the language or context." *Stormans*, 794 F.3d at 1076 (quoting *Lukumi*, 508 U.S. at 533). COVID-19 vaccination requirements have been held to be facially neutral when they apply to an entire category (i.e., all employees) and "do[] not single out employees who decline vaccination on religious grounds." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 281 (2d Cir. 2021) (per curiam) ("*WTP*"); *see also Kane*, 19 F.4th at 164 (vaccine mandate neutral because it "applies to 'all DOE staff,' as well as City employees and contractors of DOE and the City who

United States District Court
Northern District of California

1  work in DOE school settings").  The existence of religious exemptions does not undermine facial

2  neutrality.  *See Kane*, 29 F.4th at 165 (vaccine mandate neutral because its restrictions "apply

3  equally to those who choose to remain unvaccinated for any reason," including those who obtain

4  an exemption); *Ciseneroz v. City of Chicago*, 2021 WL 5630778, at *3 (vaccine mandate neutral

5  because "it applies equally to all City employees, regardless of religious belief or affiliation," and

6  "any incidental effect in burdening religion is addressed by the policy's exemption for sincerely

7  held religious beliefs").  The Mandate is facially neutral, and Plaintiffs do not contend otherwise.

8  The Mandate applies to all County personnel and does not single out employees who decline

9  vaccination on religious grounds.  *See* Aug. 5 Mem. at 1–2.  The sole mention of religion in the

10  Mandate is the religious exemption, which *benefits* those who have religious objections by

11  allowing them to apply to avoid the Mandate.  *See Ciseneroz*, 2021 WL 5630778, at *3.

12  Whether a policy is operationally neutral is usually a "more challenging" question because

13  it concerns how a policy "operate[s] in practice" and "whether it accomplishe[s] a 'religious

14  gerrymander'" by "targeting religious practices through careful legislative drafting."  *Stormans*,

15  794 F.3d at 1076 (quoting *Lukumi*, 508 U.S. at 535–37).  Plaintiffs assert no argument that the

16  Mandate is not operationally neutral.[5]  Indeed, there is no evidence that it is not operationally

17  neutral.  All the evidence before the Court shows that the Mandate applies "whether an employee

18  is eager to be vaccinated or strongly opposed [and] whether an employee's opposition or

19  reluctance is due to philosophical or political objections to vaccine requirements, concerns about

20  the vaccine's efficacy or potential side effects, or religious beliefs."  *WTP*, 17 F.4th at 266.  Again,

21  that the Mandate contains a religious exemption *benefits* religious objectors and does not

22  undermine operational neutrality.

23  Plaintiffs have not demonstrated that they are likely to prevail in showing that the Mandate

24  is not neutral.

25  <u>General Applicability</u>.  The Court next considers general applicability.  "A government

26

27  ───────────────────
28  [5] Plaintiffs' only argument about operational neutrality goes to the Accommodations, not the Mandate itself.  *See* Mot. at 6–7.  The Court considers that argument when it considers the neutrality of the Accommodations.  *See infra* Section III.A.ii.a.

1   policy will fail the general applicability requirement if it 'prohibits religious conduct while

2   permitting secular conduct that undermines the government's asserted interests in a similar way,'

3   or if it provides 'a mechanism for individualized exemptions.'" *Kennedy*, 2022 WL 2295034, at

4   *9 (quoting *Fulton*, 141 S. Ct. at 1877).  The Mandate likely does neither.

5   First, the Mandate likely does not "prohibit[] religious conduct while permitting secular

6   conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct.

7   at 1877.  The opposite appears true, in fact:  the Mandate expressly accommodates employees with

8   religious objections by allowing them to seek an exemption from the Mandate.  The makes the

9   County's Policy more favorable than other vaccination policies that have been upheld without

10   religious exemptions, even where other types of exemptions existed.  *See WTP*, 17 F.4th at 284–88

11   (finding challengers to vaccine mandate did not carry burden of showing mandate was not

12   "generally applicable," and thus subject to strict scrutiny, even where mandate had a medical

13   exemption but not a religious exemption).

14   Second, the Mandate likely does not impermissibly provide for "a mechanism for

15   individualized exemptions." *Fulton*, 141 S. Ct. at 1877.  "The mere existence of an exemption

16   that affords some minimal government discretion does not destroy a law's 'general applicability.'"

17   *Stormans*, 794 F.3d at 1082; *accord 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1187 (10th Cir.

18   2021) ("[A]n exemption is not individualized simply because it contains express exemptions for

19   objectively defined categories of persons.").  Instead, "there must be some showing that the

20   exemption procedures allow secularly motivated conduct to be favored over religiously motivated

21   conduct." *Kane*, 19 F.4th at 165.  Contrary to Plaintiffs' argument otherwise, *see* Opp. at 6, the

22   evidence before the Court shows that the exemptions in the Mandate do not "invite the

23   government to decide which reasons for not complying with the policy are worthy of solicitude."

24   *Fulton*, 141 S. Ct. at 1879.  Instead, the County possesses minimal discretion in granting

25   exemption requests.  For the religious exemption, the County does not "look beyond the face of

26   the forms and consider[s] only whether the requestor articulated a claimed religious belief, rather

27   than (for example) a political objection or a personal non-religious belief that vaccines are

28   dangerous."  Marquez Decl. ¶ 38.  In other words, the County looks to the form only to determine

United States District Court
Northern District of California

11

if the objection is in fact religious in nature.  This limited inquiry is permissible.  *See Ferrelli*, 2022 WL 673863, at *8 (citing *United States v. Seeger*, 380 U.S. 163, 185 (1965)).

Taken to its logical conclusion, Plaintiffs' argument that the mere existence of exemptions from the Mandate results in lack of general applicability (and therefore strict scrutiny) leads to illogical results.  If allowing for a religious exemption automatically triggered strict scrutiny, then governments would be incentivized to include no exemptions at all in their policies to make their policies generally applicable and thus subject to far more lenient rational basis review.  *See Ferrelli*, 2022 WL 673863, at *7 (noting the "perverse incentive for government entities to provide no religious exemption process in order to avoid strict scrutiny" if this were true).  But this cannot be.  Policies with no exemptions at all are less favorable to individuals with religious objections than policies with properly implemented religious exemptions.  The mere existence of exemptions thus cannot by itself trigger strict scrutiny.

The two cases Plaintiffs cite in support of their argument that the Mandate is not generally applicable do not control the outcome here.  First, in *Dahl v. Bd. of Tr. of W. Mich. Univ.*, the university administering the vaccine mandate "evaluate[d] whether to grant religious exemptions 'on an individual basis.'"  15 F.4th 728 (6th Cir. 2021).  Second, in *Thoms v. Maricopa Cnty. Comm. College Dist.*, 2021 WL 5162538, at *9 (D. Ariz. Nov. 5, 2021), there was evidence before the Court that defendants had issued case-by-case exemptions to its policy for secular reasons but did not make exemptions available for plaintiffs' religious reasons.  And third, in *Fulton* itself, exemptions from a city rule prohibiting foster care providers from failing to serve potential foster parents based on sexual orientation were available "at the sole discretion" of a single city official.  141 S. Ct. at 1878.  But there is no evidence before the Court that the Mandate at issue in this case operates in ways similar to any of those cases.  Unlike in *Dahl*, *Thoms*, and *Fulton*, the County does not exercise any discretion in granting a religious exemption once it determines that the exemption is sought for a religious (rather than a non-religious) reason.  Marquez Decl. ¶ 38.

Therefore, Plaintiffs have not shown they are likely to prevail in proving that the Mandate is not generally applicable.

United States District Court
Northern District of California

12

United States District Court
Northern District of California

*b.* Tiers of Scrutiny

Rational Basis.  Because it is more likely than not that the Mandate is neutral and generally applicable, it would be subject only to rational basis review.  *Fulton*, 141 S. Ct. at 1976.  The Court has no difficulty in finding that it is likely that the Mandate would pass rational basis review.  "Under rational basis review, [a court] must uphold the rules if they are rationally related to a legitimate government purpose."  *Stormans*, 794 F.3d at 1084.  First, the Supreme Court has held that "[s]temming the spread of COVID-19 is unquestionably a compelling interest," rather than merely a legitimate one.  *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63, 67 (2020).  And second, as numerous courts have held, requiring employees to be vaccinated is rationally related to that interest because data show that approved COVID-19 vaccines drastically reduce the chances of contracting and spreading the virus, or of being afflicted with serious illness or death from COVID-19 if the virus is contracted.  *See* ECF No. 31-4 ("Rudman Decl.") ¶¶ 18–19, 23–26; *accord, e.g.*, *Does 1-6 v. Mills*, 566 F. Supp. 3d 34, 52 (D. Me. 2021) ("*Mills I*") (vaccine mandate survived rational basis review because "unvaccinated individuals substantially more likely both to contract COVID-19 and to suffer serious medical consequences as a result"), *aff'd*, *Mills II*; *WTP*, 17 F.4th at 290 (vaccine mandate survived rational basis review because "employees at healthcare facilities . . . might become infected and expose other to the virus" absent the mandate); *Wise*, 2021 WL 4951571, at *3 (vaccine mandate survived rational basis review because it would "increas[e] vaccination rates among those employees who come into regular contact with vulnerable populations").

Strict Scrutiny.  Although the Court need not consider the matter, the Court also finds that it is more likely than not that the Mandate would survive strict scrutiny even if the Mandate were not neutral or generally applicable.  To satisfy strict scrutiny, the County must "demonstrat[e] [that] its course was justified by a compelling state interest and was narrowly tailored in pursuit of that interest."  *Kennedy*, 2022 WL 2295034, at *9 (citing *Lukumi*, 508 U.S. at 546).  Because the Supreme Court has found that stemming the spread of COVID-19 is a compelling interest, *Roman Catholic Diocese*, 141 S. Ct. at 67, the question is only whether the Mandate is "narrowly tailored" to that interest.

1    The Court finds it is more likely than not that the Mandate is narrowly tailored.  The

2    County instituted the Mandate after examining data showing that "vaccination is critical to

3    reducing COVID-19 transmission and the risk of severe illness, hospitalization, and death from

4    COVID-19."  Rudman Decl. ¶ 18.  Data in the County itself confirms this general principle.  As of

5    January 2022, unvaccinated adult County residents were about 18 times more likely than fully

6    vaccinated and booster County residents to become infected with COVID-19.  *Id.*  There were 41

7    times more cases in unvaccinated individuals than vaccinated and boosted individuals between

8    December 15, 2021 and March 31, 2022, during the height of the Omicron variant.  *Id.*  Data show

9    that while use of personal protective equipment and frequent testing are also important to reducing

10   the spread of COVID-19, those measures are not as effective as vaccination.  *Id.* ¶¶ 19, 26 & n.3.

11   Additionally, these data apply with particular force to County employees, who regularly work with

12   vulnerable populations among the County's residents.  *See* Rudman Decl. ¶¶ 23–26 (explaining

13   data showing that hospital patients and staff and inmates in prisons and jails are particularly

14   vulnerable to COVID-19).  These data and conclusions comport with the data and conclusions

15   presented to other courts about COVID-19 vaccines.  *See, e.g.*, *Mills I*, 2021 WL 4783626, at *13

16   ("[T]he gold standard to prevent and stop the spread of communicable diseases, including

17   COVID-19, is vaccination."); *Ciseneroz*, 2021 WL 5630778, at *3 (data showed that City of

18   Chicago employees were "twice as likely to be infected with COVID-19—as compared to all

19   Chicago residents—due to City employees' frequent public contact based on the nature of their

20   work").[6]

21   Plaintiffs have submitted the declaration of Dr. Jayanta Bhattacharya in which he opines

22   that "[t]he scientific evidence strongly indicates that the recovery from COVID disease provides

23   strong and lasting protection against severe disease if reinfected, as least as good and likely better

24   than the protection offered by the COVID vaccines."  ECF No. 27-2 ¶ 7.  But Dr. Bhattacharya's

---

[6] Because the Mandate contains a religious exemption, the Court need not consider if the Mandate would satisfy strict scrutiny if it only contained a medical exemption.  *See* Opp. at 15–16; *cf. WTP*, 17 F.4th at 286 (upholding vaccine mandate under strict scrutiny, notwithstanding medical exemption and lack of religious exemption, because "the medical exemption is not as harmful to the legitimate governmental interests purportedly justifying the [vaccine] Rule as a religious exemption would be").

declaration expresses his opinions on the Occupational Health and Safety Administration's emergency temporary standard related to COVID-19 vaccines, not the County's Mandate.  *See id.* ¶ 6.  The Court thus finds his opinions less relevant than those of Dr. Rudman, which are based on data specific to the County.  *See* Rudman Decl. ¶¶ 18–19 (discussing County-specific data).  At most, the conflicting opinions of Dr. Bhattacharya and Dr. Rudman create a battle of the experts precluding a finding that Plaintiffs are likely to succeed on the merits on the basis of Dr. Bhattacharya's opinions.

*     *     *

Accordingly, Plaintiffs have failed to show a likelihood of success on the merits of their Free Exercise Claim against the Mandate.  The evidence produced shows that it is more likely than not that the Mandate is neutral and generally applicable and survives rational basis review (and strict scrutiny, even if the Mandate was subject to those more demanding requirements).

### ii.    Accommodations

The Court now separately considers whether the Accommodations offered by the County to exempt employees satisfy constitutional scrutiny.

As an initial matter, the County discusses Plaintiffs' Free Exercise challenge to the Accommodations as if it was a claim under Title VII.  *See* Opp. at 16–23 (discussing Title VII standards and analysis).  This is puzzling.  Plaintiffs do not assert a Title VII claim in their Complaint, and numerous cases that the County cites in its opposition brief have analyzed accommodations schemes using the same Free Exercise framework the Court has already used to analyze the Mandate.  *See Kane*, 19 F.4th at 164–69; *Mills II*, 16 F.4th at 29–35; *Ferrelli*, 2022 WL 673863, at *5–9.  The Court accordingly applies the Free Exercise analysis to the Accommodations.

#### a.    Fulton *Analysis*

Neutrality.  The Court once again considers both facial and operational neutrality, this time as to the Accommodations.  Plaintiffs do not contend that the Accommodations framework is not facially neutral.  Instead, the dispute centers on the operational neutrality of a single part of the Accommodations:  the County's prioritization of medical and disability exemptions over religious

exemptions for other available County positions in lower- or intermediate-risk tiers.  *See* Opp. at 6–7.

Plaintiffs do not contend, and there is no evidence that, the general set of accommodations available to exempt employees under the Policy is not facially and operationally neutral.  The sorting of exempt employees into three risk tiers, based on criteria that do not include the basis for which the employee's exemption was obtained, neither "refers to a religious practice without secular meaning discernable from the language or context," *Stormans*, 794 F.3d at 1076, nor "target[s] religious practices through careful legislative drafting" but discriminatory implementation, *id.*  For example, Plaintiffs do not contend that the religion of an employee (or the fact that an employee has a religious exemption) influences the risk tier into which that employee's position is sorted.  Nor do Plaintiffs contend (or produce evidence) that, for example, any exempt employees in high-risk roles are allowed to remain in their high-risk position if they are unvaccinated.[7]  The County's sworn statement that all exempt employees in high-risk roles were placed on administrative leave—regardless of the basis for their exemption—remains unrebutted.  Marquez Decl. ¶ 42.  Thus, it is more likely than not that the general Accommodations scheme of assigning employees to risk tiers and granting different forms of accommodations to the different tiers is neutral.

The County's implementation of a specific portion of the Accommodations framework— the consideration of exempt employees for available County positions of lower- or intermediate-risk—raises operational neutrality issues.  The County admits that in assisting exempt employees in high-risk roles with transfers to available County positions in other risk tiers, the County gives "those with disability or medical contraindication vaccine exemptions . . . 'preferential consideration' pursuant to California State Disability Regulations and the Americans with Disabilities Act."  Marquez Decl. ¶ 41.  The Court finds that this portion of the Accommodations framework likely "operate[s] in practice" in way that "target[s] religious practices" by placing

---

[7] Because the County never applied for a waiver (made available by the County Health Department and not specifically part of the County's Policy for its own employees) allowing unvaccinated employees to work in higher-risk settings due to "critical staffing concerns," Marquez Decl. ¶¶ 50–51 & Ex. 11, the availability of the waiver does not affect this analysis.

16

United States District Court
Northern District of California

United States District Court
Northern District of California

1   those with religious exemptions at a disadvantage behind those with secular exemptions (medical

2   and disability). *Stormans*, 794 F.3d at 1076 (quoting *Lukumi*, 508 U.S. at 535–37).  Thus,

3   Plaintiffs have shown that they are likely to succeed in proving that this portion of the

4   Accommodations framework is not operationally neutral.[8]

5       The County first seeks to justify this distinction by reference to California disability

6   regulations and the Americans with Disabilities Act.  *See* Marquez Decl. ¶ 41; *cf.* Opp. at 23

7   (arguing in context of Title VII argument that the "County is subject to requirements of federal

8   and disability law").  The Court is sympathetic to the County's commitment to fulfilling its

9   statutory and ethical obligations to treat its disabled employees fairly.  But under the Supremacy

10  Clause, the edicts of the federal Constitution trump any obligation to comply with federal or state

11  statutory or regulatory requirements.  U.S. Const. art. VI, cl. 2.  Even if federal or California

12  disability law requires priority consideration of disabled applicants for open government positions,

13  the County cannot grant that class of individuals priority consideration over those with religious

14  exemptions in violation of the First Amendment.

15      The County then protests that giving employees in high-risk roles with religious

16  exemptions priority consideration for vacant County positions would violate the Establishment

17  Clause.  *See* Opp. at 23.  But the County misconstrues Plaintiffs' argument.  Plaintiffs do not

18  seek—and the Court's findings do not require—priority consideration for employees in high-risk

19  roles with religious exemptions over those with secular exemptions.  The Free Exercise Clause

20  requires that the County not treat any "comparable secular activity *more favorably* than religious

21  exercise" to avoid strict scrutiny, *Roman Catholic Diocese*, 141 S. Ct. at 67–68, not that the

22  County treat those with religious exemptions more favorably than those with secular exemptions.

23  Plaintiffs seek only equal treatment to those with secular exemptions.

24      Finally, in the context of defending the Mandate, the County cites to cases finding that

25  _____

26  [8] Plaintiffs also point to an email they say demonstrates the County's disparate treatment of
    religious exemptions in this part of the Accommodations framework.  *See* Compl. at Ex. E.

27  Because the County has admitted that is engages in prioritization of secular exemptions in this
    context, Marquez Decl. ¶ 41, the Court need not consider whether the email is properly

28  authenticated evidence of that practice.  *See* Opp. at 22–23 (contesting authenticity and relevance
    of email).

religious and medical exemptions are not "comparable" for the purposes of evaluating neutrality and general applicability. *Cf.* Opp. at 16. An exemption for medical contraindications does not undermine the County's interest in protecting the health of its workers and vulnerable populations in the same way a religious exemption does, the County says, because forcing someone to become vaccinated who would be physically harmed by the vaccine is not the same as forcing someone with a religious objection to take the vaccine. *Id.* To the extent the County's argument also applies to the priority consideration portion of the Accommodations framework, the Court does not find it persuasive. The asserted difference between medical and religious exemptions from a vaccine mandate that those cases recognize—that medical exemptions prevent physical harm consistent with the government's interest in ensuring public health and safety, while religious exemptions do not—does not apply to the type of *accommodations* the County offers once it has granted exemptions from the Mandate. For the purposes of considering exempt employees in high-risk roles for vacant County positions, all three types of exemptions are "comparable" activities based on the "asserted government interest that justifies" the transfer of those employees to lower-risk positions: "the significant health and safety risks to and posed by unvaccinated employees working in high-risk roles." Marquez Decl. ¶ 37; *Roman Catholic Diocese*, 141 S. Ct. at 67. The different reasons for an exemption do not affect the amount of risk the exempt employees pose to other employees or the populations the County serves.

Accordingly, the Court finds that it is more likely than not that while the general Accommodations framework is facially and operationally neutral, the part of the framework that prioritizes employees in high-risk roles with secular exemptions over those with religious exemptions for consideration for vacant County positions is not neutral.

General Applicability. The Court finds that the general Accommodations framework is also more likely to be found generally applicable for similar reasons as it is neutral. The sorting of exempt employees into the three risk tiers does not consider the reason for the exemption, so the Accommodations framework does not "prohibit religious conduct while permitting secular conduct that undermines the government's asserted interests in a similar way." *Fulton*, 141 S. Ct. at 1877. Nor does the general Accommodations framework create "a mechanism for

18

1    individualized exemptions." *Id.* There is no evidence before this Court that the process of sorting

2    of exempt employees' positions into risk tiers contains any exemptions.

3        Because the Court has already found that Plaintiffs are likely to succeed on their claim that

4    implementation of the process for considering exempt employees for available County positions of

5    lower- or intermediate-risk—in which the County prioritizes medical and disability exemptions

6    over religious exemptions—is not neutral, it need not consider whether it is generally applicable.

7    *Fulton*, 141 S. Ct. at 1976 (regulation must be neutral *and* generally applicable to avoid strict

8    scrutiny).

9                    *b.  Tiers of Scrutiny*

10       Rational Basis.  Because it is more likely than not that the Accommodations framework as

11   a general matter is neutral and generally applicable, it would be subject to rational basis review.

12   *Fulton*, 141 S. Ct. at 1976.  Once again, the Court has no difficulty in finding that it is more likely

13   than not that the general Accommodations framework satisfies this test because it is "rationally

14   related to a legitimate government purpose." *Stormans*, 794 F.3d at 1084.  "Stemming the spread

15   of COVID-19 is unquestionably a compelling interest." *Roman Catholic Diocese*, 141 S. Ct. at

16   67.  And second, sorting employees into risk tiers and granting them different accommodations

17   based on the level of risk they pose to others and the population the County serves is more likely

18   to be found to be "rationally related" to the interest in preventing the spread of COVID-19.

19   Plaintiffs have failed to show they are likely to prevail in proving that the general

20   Accommodations framework fails rational basis review, and thus it will not be enjoined.

21       Strict Scrutiny.  Even if the Court had determined that strict scrutiny should apply to the

22   general Accommodations framework, the Court finds that it is more likely than not that it would

23   satisfy strict scrutiny because it is "narrowly tailored" to the compelling interest of preventing the

24   spread of COVID-19.  *Roman Catholic Diocese*, 141 S. Ct. at 67.  Rather than lumping all

25   positions occupied by exempt employees into a single set of offered accommodations, the County

26   divides the exempt employees' roles into three tiers based on the level of COVID-19 transmission

27   risk.  Marquez Decl. ¶ 36.  This was determined by considering several factors, such as the nature

28   of contact the employee had with others; the risk posed to vulnerable populations; the risk posted

United States District Court
Northern District of California

1    to employees; and the essential job functions of the employee.  *Id.*  None of those factors

2    considered the reason for an employee's exemption.  *Id.*  The County then offered different

3    accommodations for each of the different tiers, with the accommodations getting progressively

4    stricter based on the increasing risk of COVID-19 spread in each tier.  *Id.* at 37.  The Court finds

5    that this scheme is more likely to be proved to be "narrowly tailored" to the interest in stemming

6    the spread of COVID-19.

7         Because giving priority consideration to employees in high-risk roles with secular

8    exemptions over those with religious exemptions is not likely to be neutral, that portion of the

9    Accommodations framework would be subject to strict scrutiny.  The Court finds that Plaintiffs

10   have shown that they are likely to prevail in showing that this single portion of the framework is

11   not narrowly tailored to the compelling interest in preventing the spread of COVID-19.  The risk

12   posed by an unvaccinated, exempt employee is the same regardless of the reason that the

13   employee obtained the exemption.  In other words, an employee exempt from the Mandate for

14   medical reasons presents the same risk of COVID-19 transmission in a high-risk role as does an

15   employee exempt from the Mandate for religious reasons.  Nor does the type of exemption an

16   employee obtained affect the suitability of that employee for a lower- or intermediate-risk

17   position.  Accordingly, giving priority consideration to employees in high-risk roles for secular

18   exemptions over those with religious exemptions is likely to fail strict scrutiny, and Plaintiffs have

19   shown a likelihood of success on the merits as to this portion of the Accommodations framework

20   only.

21        To be clear, this finding does not preclude the County from evaluating each applicant for a

22   vacant County position based on other criteria, such as an applicant's experience in similar roles or

23   their satisfaction of minimum job qualifications.  The County is only prohibited from prioritizing

24   employees with secular exemptions over those with religious exemptions during the preliminary

25   injunction period.

26                                    *        *        *

27        Because the Court has concluded that Plaintiffs are only likely to succeed on the merits of

28   their Free Exercise claim regarding the County's preferential treatment of certain types of exempt

United States District Court
Northern District of California

20

1   employees over others for consideration for available County positions in its Accommodations

2   framework, the Court considers the remaining *Winter* factors as to that part of the Policy only.

3   *Edge v. City of Everett*, 929 F.3d 657, 663 (9th Cir. 2019) (court only need analyze remaining

4   *Winter* factors if plaintiff shows likelihood of success on the merits).

**B.   Irreparable Harm**

6       Plaintiffs must show that they are "likely to suffer irreparable harm in the absence of

7   preliminary relief." *Winter*, 555 U.S. at 20.  Plaintiffs argue that the infringement of their Free

8   Exercise rights constitutes irreparable injury.  Mot. at 8.  The County argues that Plaintiffs' true

9   claimed harm is the loss of their employment, which is not irreparable injury, and that there is no

10  demonstrated Free Exercise injury.  Opp. at 24–25.

11      The Court finds that Plaintiffs have shown irreparable injury.  Plaintiffs are correct that

12  loss of Free Exercise rights "for even minimal periods of time" is irreparable injury.  *See Roman*

13  *Catholic Diocese*, 141 S. Ct. at 68 (citing *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality

14  op.)).  Here, the Court has found that the prioritization of employees in high-risk roles with secular

15  exemptions over those with religious exemptions for vacant County positions is likely to violate

16  the Free Exercise Clause.  Plaintiffs have thus shown irreparable injury for that portion of the

17  Policy.

18      The County's only other argument is that Plaintiffs cannot show irreparable harm because

19  they delayed seeking injunctive relief, as the Court found in denying their motion for a temporary

20  restraining order.  *See* Opp. at 24.  While it is true the delay in seeking injunctive relief may

21  sometimes be grounds for denying that relief, *see Lydo Enters., Inc. v. City of Las Vegas*, 745 F.2d

22  1211, 1213–14 (9th Cir. 1984), the Court declines to find a lack of irreparable harm on this basis.

23  The Court's denial of the motion for a temporary restraining order does not support the County's

24  argument because temporary restraining orders are often granted on extremely limited timelines

25  and are reserved for the most urgent situations.  That is not the case here, where Plaintiffs have

26  sought a preliminary injunction on a schedule imposed by the Court.  Plaintiffs' counsel also states

27  that she only became aware of the priority consideration element of the County's

28  Accommodations framework in February 2022, the month in which this lawsuit was filed.  ECF

United States District Court
Northern District of California

No. 27-1 ("Gondiero Decl.") ¶ 3.  The County also faults Plaintiffs for failing to gather and present evidence after the motion for a temporary restraining order was denied, Opp. at 25, but the Court's narrow finding that a portion of the Accommodations framework violates the Free Exercise Clause is based on the County's own admission, not allegations in Plaintiffs' Complaint.

Plaintiffs have accordingly shown irreparable harm regarding the priority consideration portion of the Accommodations framework.

### C.    Balance of the Equities and Public Interest

Finally, the Court considers the balance of the equities and the public interest.  When the government is a party to a lawsuit, the final two factors in the preliminary injunction analysis merge.  *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).  The Court finds that this merged factor favors an injunction.  While the County and the public do have great interest in keeping people, particularly vulnerable populations, safe and reducing the spread of COVID-19, the Court has already found that the priority consideration portion of the Accommodations framework is not likely to further that interest.  Thus, unlike the Mandate and the other parts of the Accommodations framework, this portion of the Accommodations framework is not "directly aimed at promoting the public interest" in reducing the spread of COVID-19.  *See WTP*, 17 F.4th at 295; *Mills I*, 2021 WL 4783626, at *17.  On the other hand, Plaintiffs face hardships from being sent to the back of the line for consideration for County positions in lower- or intermediate-risk tiers based on the fact that their exemption is religious, which likely violates their constitutional rights.  "[I]t is always in the public interest to prevent the violation of a party's constitutional rights."  *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (quoting *Elrod*, 427 U.S. at 373).  The County, on the other hand, has not articulated any hardship it would face if this portion of the Accommodations framework was not enforced.  The balance of the equities and the public interest favor injunctive relief as the priority consideration portion of the Accommodations framework.

*         *         *

The Court has found that Plaintiffs have satisfied all the *Winter* factors as to the portion of the Accommodations regime that grants priority consideration for vacant County positions to

United States District Court
Northern District of California

employees in high-risk roles with secular exemptions over those who have religious exemptions. The Court will accordingly enter a preliminary injunction against that portion of the Accommodations framework.  Because Plaintiffs have not shown a likelihood of success on the merits as to any other portion of the Policy, the Court will otherwise deny preliminary injunctive relief.

**IV.    ORDER**

For the foregoing reasons, IT IS HEREBY ORDERED that Plaintiffs' motion for a preliminary injunction is GRANTED IN PART and DENIED IN PART.  Defendants and their agents, employees, and successors in office are RESTRAINED AND ENJOINED from giving to employees whose current positions are in high-risk tiers any priority consideration for vacant County positions based on the type of exemption from the County's vaccine mandate that the employee received.  The preliminary injunction SHALL remain in effect during the pendency of this case, unless earlier terminated by subsequent order of the Court.

Dated:  June 30, 2022

_____
BETH LABSON FREEMAN
United States District Judge