1    TONY LOPRESTI, County Counsel (S.B. #289269)
     BRYAN K. ANDERSON, Deputy County Counsel (S.B. #170666)
2    NATHAN A. GREENBLATT, Deputy County Counsel (S.B. #262279)
     OFFICE OF THE COUNTY COUNSEL
3    70 West Hedding Street, East Wing, Ninth Floor
     San José, California 95110-1770
4    Telephone: (408) 299-5900
     Facsimile: (408) 292-7240
5    Bryan.Anderson@cco.sccgov.org
     Nathan.Greenblatt@cco.sccgov.org
6
     Attorneys for Defendants
7    COUNTY OF SANTA CLARA, SARA H. CODY,
     JAMES WILLIAMS, and JEFFREY SMITH
8

9                        UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF CALIFORNIA
10                              (San José Division)

11

12   UNIFYSCC, an unincorporated California       No. 22-CV-01019 BLF
     association on behalf of employees in Santa
13   Clara County; TOM DAVIS, an individual; and  **DEFENDANTS' OPPOSITION TO**
     MARIA RAMIREZ, an individual,                **PLAINTIFFS' MOTION FOR CLASS**
14                                                 **CERTIFICATION**
                     Plaintiffs,
15                                                 Date:      December 20, 2023
     v.                                            Time:      9:00 a.m.
16                                                 Ctrm:      3, 5th Floor
     SARA H. CODY, in her official capacity as the Judge:      The Honorable Beth Labson Freeman
17   Santa Clara County Public Health Officer;
     JAMES WILLIAMS, in his official capacity as
18   the County Counsel of Santa Clara County;
     JEFFREY SMITH, in his official capacity as the
19   County Executive of Santa Clara County; and
     SANTA CLARA COUNTY,
20
                     Defendants.
21

22

23

24

25

26

27

28

# **TABLE OF CONTENTS**

Page

I.     INTRODUCTION ........................................................................................ 1

II.    FACTUAL BACKGROUND ...................................................................... 2

       A.    THE COUNTY'S RESPONSE TO THE COVID-19 PANDEMIC..................... 2

       B.    THIS LAWSUIT............................................................................... 4

       C.    DEVELOPMENTS SINCE THE COURT'S PRELIMINARY INJUNCTION
             ORDER........................................................................................ 4

             1.    The County Promptly Complied with the Court's Order ......................... 4

             2.    In Practice, the County Treated All Exempt Employees Equally .............. 5

             3.    The County Relaxed the Vaccination Health Orders and Vaccination
                   Requirement as the Pandemic Subsided .................................................... 6

       D.    THE PROPOSED CLASS..................................................................... 6

       E.    THE PROPOSED CLASS REPRESENTATIVES ............................................. 7

III.   LEGAL STANDARDS............................................................................... 7

       A.    CLASS CERTIFICATION..................................................................... 7

       B.    DEFERENCE TO PUBLIC HEALTH OFFICIALS ........................................... 8

IV.    ARGUMENT ............................................................................................. 9

       A.    PLAINTIFFS FAIL TO SATISFY RULE 23(A).............................................. 9

       B.    PLAINTIFFS FAIL TO SATISFY RULE 23(b)(1)(A)......................................15

       C.    PLAINTIFFS FAIL TO SATISFY RULE 23(b)(3) ............................................16

             1.    Common Questions of Law and Fact Do Not Predominate.....................17

                   a.    *Free Exercise Clause* ................................................17

                   b.    *FEHA*........................................................................19

                   c.    *Equal Protection* ................................................20

                   d.    *Establishment Clause* ................................................20

                   e.    *Title VII*....................................................................21

                   f.    *Monell*......................................................................21

             2.    Plaintiffs Do Not Establish that Damages Can Be Measured Across the
                   Entire Class, Consistent with Plaintiffs' Liability Case .........................22

a.   *Plaintiffs' Scenario 1 Damages Model Ignores Crucial Individualized Inquiries*..............................................................23

b.   *Plaintiffs' Scenario 2 Damages Model Is a Meaningless Computation Untethered to Plaintiffs' Liability Theory* ...............24

V.   CONCLUSION ........................................................................................................25

Defendants' Opposition to Plaintiffs'                                      22-CV-01019 BLF
Motion for Class Certification

1

## TABLE OF AUTHORITIES

2

Page

3

<u>Cases</u>

4

*Britton v. Servicelink Field Servs., LLC*
No. 2:18-CV-0041-TOR, 2019 WL 3400683 (E.D. Wash. July 26, 2019) ................................... 8

5

*C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*
654 F.3d 975 (9th Cir. 2011) .................................................................................................. 15, 20

6

7

*Caudle v. Bristow Optical Co.*
224 F.3d 1014 (9th Cir. 2000) ....................................................................................................... 23

8

*Comcast Corp. v. Behrend*
569 U.S. 27 (2013) .............................................................................................................. passim

9

*Cummings v. Starbucks Corp.*
No. CV 12-06345-MWF FFMX, 2014 WL 1379119 (C.D. Cal. Mar. 24, 2014) ........................ 18

10

*Daskalea v. Washington Humane Soc.*
275 F.R.D. 346 (D.D.C. 2011) ..................................................................................................... 16

11

12

*Dennis F. v. Aetna Life Ins.*
No. 12-CV-02819-SC, 2013 WL 5377144 (N.D. Cal. Sept. 25, 2013) ........................................ 12

13

14

*Doster v. Kendall*
342 F.R.D. 117 (S.D. Ohio 2022) ........................................................................................... 15, 16

15

16

*Doyle v. Chrysler Grp., LLC*
663 F. App'x 576 (9th Cir. 2016) .................................................................................................. 25

17

*Ford Motor Co. v. E.E.O.C.*
458 U.S. 219 (1982) ....................................................................................................................... 23

18

*Frausto v. Bank of Am., Nat'l Ass'n*
No. 18-CV-01202-LB, 2021 WL 2476902 (N.D. Cal. June 17, 2021) ......................................... 18

19

20

*Gartin v. S & M NuTec LLC*
245 F.R.D. 429 (C.D. Cal. 2007) .................................................................................................. 24

21

22

*Groff v. DeJoy,*
143 S.Ct. 2279 (2023) ................................................................................................................ 13, 21

23

*Hanson v. Lucky Stores, Inc.*
74 Cal.App.4th 215 (1999) ............................................................................................................ 13

24

*In re Wells Fargo Home Mortg. Overtime Pay Litig.*
268 F.R.D. 604 (N.D. Cal. 2010) ................................................................................................ 9, 11

25

26

*Kao v. Univ. of San Francisco*
229 Cal.App.4th 437 (2014) .......................................................................................................... 23

27

*Kavianpour v. Bd. of Regents of Univ. Sys. of Georgia*
No. 1:20-CV-152-MLB, 2023 WL 2733381 (N.D. Ga. Mar. 31, 2023) ...................................... 17

28

iii

*Kennedy v. Bremerton Sch. Dist.*
  142 S.Ct. 2407 (2022) ............................................................................................................ 17

*Lara v. First Nat'l Ins. Co. of Am.*
  25 F.4th 1134 (9th Cir. 2022) ............................................................................................... 22

*Martin v. Lockheed Missiles & Space Co.*
  29 Cal.App.4th 1718 (Cal. Ct. App. 1994) ......................................................................... 20

*Mauck v. McKee*
  No. 18-CV-04482-NC, 2019 WL 11585408 (N.D. Cal. Aug. 2, 2019) ....................................... 22

*Mazur v. eBay Inc.*
  257 F.R.D. 563 (N.D. Cal. 2009) ......................................................................................... 23

*Nunes v. Wal-Mart Stores, Inc.*
  164 F.3d 1243 (9th Cir. 1999) ....................................................................................... 13, 19

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*
  31 F.4th 651 (9th Cir. 2022) .................................................................................................. 8

*Prince v. Mass.*
  321 U.S. 158 (1944) ............................................................................................................. 20

*Pryor v. Aerotek Sci., LLC*
  278 F.R.D. 516 (C.D. Cal. 2011) ........................................................................................... 9

*Seaplane Adventures, LLC v. Cnty. of Marin*
  71 F.4th 724 (9th Cir. 2023) ............................................................................................ 8, 12

*Siino v. Foresters Life Ins. & Annuity Co.*
  340 F.R.D. 157 (N.D. Cal. 2022) ......................................................................................... 25

*Stormans, Inc. v. Wiseman*
  794 F.3d 1064 (9th Cir. 2015) .............................................................................................. 17

*Svenson v. Google Inc.*
  No. 13-CV-04080-BLF, 2016 WL 8943301 (N.D. Cal. Dec. 21, 2016) ....................................... 25

*U.S. Equal Emp. Opportunity Comm'n v. MJC, Inc.*
  400 F. Supp. 3d 1023 (D. Haw. 2019) ................................................................................ 13

*Van v. Plant & Field Serv. Corp.*
  672 F. Supp. 1306 (C.D. Cal. 1987) ..................................................................................... 23

*Vasquez v. Los Angeles Cnty.*
  487 F.3d 1246 (9th Cir. 2007) ......................................................................................... 14, 20

*Ventures Edge Legal PLLC v. GoDaddy.com LLC*
  No. CV-15-02291-PHX-GMS, 2018 WL 619723 (D. Ariz. Jan. 30, 2018) .................................. 12

*Wallace v. County of Stanislaus*
  245 Cal.App.4th 109 (2016) ................................................................................................ 20

//

iv

*Wal-Mart Stores, Inc. v. Dukes*
  564 U.S. 338 (2011) ................................................................................................. passim

*Zinser v. Accufix Research Institute, Inc.*
  253 F.3d 1180 (9th Cir. 2001)................................................................................... 16

## STATUTES AND CODES

California Government Code

Section 12940(a) ........................................................................................................ 20

United States Constitution

Amend. I ..................................................................................................................... 17

Federal Rules of Civil Procedure

Rule 23......................................................................................................................... 8

Rule 23(a) ........................................................................................................... 7, 9, 16

Rule 23(b) ..................................................................................................................... 8

Rule 23(b)(1)(A) ..............................................................................................8, 9, 15, 16

Rule 23(b)(3).................................................................................................9, 16, 22, 25

Federal Rules of Evidence

Rule 702........................................................................................................................ 25

Defendants' Opposition to Plaintiffs'                                    22-CV-01019 BLF
Motion for Class Certification

# I.     INTRODUCTION

Plaintiffs seek to certify a diverse class of 463 employees of the County of Santa Clara ("County"), including 260 healthcare professionals and 158 correctional officers, to challenge how they were treated in the County's individualized accommodation process after they obtained religious exemptions to the County's emergency COVID-19 vaccination requirement, which was designed to limit the spread of the deadly new disease to vulnerable members of the community.

The Court should deny Plaintiffs' motion.  The County ended the challenged policies a year ago, and broad-based prospective injunctive relief for any class is no longer at issue.  Plaintiffs nevertheless invite this Court to second-guess the County's emergency public health measures by inappropriately expanding this case into a class action.  The Court should decline that invitation to make broad constitutional rulings about the local government's pandemic response.  Instead, as the Ninth Circuit has emphasized, the Court should give deference to the difficult choices local public health officials made to combat the pandemic.

That is particularly true where, as here, Plaintiffs fail to meet the basic legal requirements for class certification.  Plaintiffs do not identify any common question that can be answered the same way for all proposed class members.  Instead, Plaintiffs based their legal claims on narrow challenges as to whether the County disadvantaged proposed class members who sought job transfers, and to whether the County misclassified a few proposed class members as "high risk."  Both of those challenges require fact-specific, highly individualized inquiries.

For example, many proposed class members never sought a job transfer, and thus cannot claim to have been disadvantaged.  Many proposed class members received job transfer assistance but were not qualified for alternative positions.  Some proposed class members obtained employment outside the County.  And critically, many proposed class members sought and obtained job transfers or modifications.  In fact, the County provided *equal* job transfer assistance to all employees and succeeded in transferring more employees with religious exemptions than employees with medical or disability exemptions to new positions.  These facts—which Plaintiffs conspicuously omit from their motion—demonstrate that whether each proposed class member was actually disadvantaged in job transfers depends on fact-specific, highly individualized inquires.

Defendants' Opposition to Plaintiffs'
Motion for Class Certification

22-CV-01019 BLF

Plaintiffs likewise base their challenge to the County's evaluation of an employee's risk of COVID-19 transmission, severe illness, or death—its "Risk Tier System"—on a narrow, fact-specific inquiry. Plaintiffs (incorrectly) cite a few examples of employees that the County allegedly misclassified as high-risk, such as roofers, and assert that such examples somehow render the entire Risk Tier System so irrational that it is unconstitutional. But Plaintiffs never explain what an allegedly misclassified roofer has to do with the County's high-risk classification of 260 healthcare professionals and 158 correctional officers. And in any event, Plaintiffs' classification challenge relies on highly fact-specific details of individual risk profiles, such as what percentage of time each roofer spent in high-risk facilities. This is not a theory that merits class certification.

Plaintiffs further fail to meet basic legal requirements for class certification, because their damages models do not establish that damages can be measured across the entire class, consistent with their liability case. Plaintiffs' damages expert admitted at his deposition that he lacked even a basic understanding of Plaintiffs' liability case. He did not know that Plaintiffs' liability case turns on alleged preferential treatment in job transfers. And he ignores the fact that many class members suffered no damages because they waived their exemption and became vaccinated. As a result, his damages model fails to address preferential treatment in job transfers, and includes a majority of members with no damages at all. These glaring failures alone warrant denying Plaintiffs' motion.

Accordingly, the Court should deny Plaintiffs' motion for class certification.

## II.      FACTUAL BACKGROUND

### A.      THE COUNTY'S RESPONSE TO THE COVID-19 PANDEMIC

COVID-19 was a new, highly contagious disease first identified in late 2019. Rudman Decl. ¶ 7. It spread rapidly throughout the United States beginning in March 2020. *Id.* Since then, the Centers for Disease Control and Prevention has reported over 1.1 million deaths from the virus in the United States alone. *Ibid.* In Santa Clara County, a county with a population of 1.9 million people, 2,936 people have died from COVID-19, and hundreds of thousands have been infected. *Id.*

Almost everything about COVID-19 was unknown initially. Its origin was unknown. *Id.* ¶ 8. Its mechanisms of transmission were unknown. *Id.* Its symptoms were unknown. *Id.* Its long-term effects were unknown. *Id.* Its effects on different populations (e.g., children) were unknown.

*Id.* How to treat it was unknown. *Id.* Whether a vaccine could be developed was unknown. *Id.*

In the face of this unprecedented health crisis and great uncertainty, public health officials in Santa Clara County marshalled all available resources to protect the public. The County's Public Health Department, led by Dr. Sara Cody, quickly mobilized to develop public health policies that the developing science on COVID indicated could protect the public from infection, disease, and death. The County procured personal protective equipment, established and expanded clinical and supportive services, and set up an Emergency Response Center that the County staffed with dedicated employees 24/7. *Id.* ¶ 9. The County also promulgated health orders to protect the public. For example, the County's Health Officer swiftly issued orders to cancel mass gatherings and to shelter in place in March 2020, issued orders to safeguard supplies of personal protective equipment in April 2020, and established face covering and social distancing protocols in July 2020. *Id.* ¶ 10. The County instituted these temporary protective measures while awaiting medical measures that could effectively prevent or treat COVID-19 infections, disease, and death.

In December 2020, COVID-19 vaccines became available, starting with the Pfizer-BioNTech vaccine. After extensive study, scientists concluded that vaccination was (and remains) critical to reducing COVID-19 transmission and the risk of severe illness, hospitalization, and death. *Id.* ¶ 11.

In summer 2021, the Delta variant of COVID-19 began spreading rapidly in the United States. *Id.* ¶ 12. The Delta variant was more than twice as contagious as variants that preceded it and caused more severe illness. The County responded accordingly. In July 2021, Dr. Cody urged all businesses and governmental entities to implement mandatory vaccination requirements for all personnel. *Id.,* Ex. 1 at ¶ 28. On August 5, 2021, the County issued a policy requiring County employees to become vaccinated, and provided an accommodations framework for employees seeking an exemption based on medical and religious grounds. Doyle Decl. ¶ 4; ECF No. 44 at 2-5.

In winter 2021, another variant of COVID-19, Omicron, again caused COVID-19 cases to surge. Omicron was two to four times as infectious as Delta. Rudman Decl., Ex. 1 at ¶ 21. During the Omicron surge, unvaccinated individuals were much more likely than vaccinated individuals to become infected and to require hospitalization. *Id.*, Ex. 1 at ¶¶ 18, 20, 41. To address this surge, the Dr. Cody issued a December 28, 2021 Order Requiring Up-to-Date COVID-19 Vaccination of

3

1   Personnel in Higher-Risk Settings.  *Id.*, Ex. 1 at ¶ 29.

2          The County's efforts to protect the public from COVID-19 were successful.  While the U.S.

3   had 316 deaths per 100,000 residents and California had 259, Santa Clara County had significantly

4   less—only 130—despite being located in Silicon Valley, an epicenter of commerce and virus

5   transmission risk.  *Id.* ¶ 30.  The County's efforts in promoting vaccination in the community

6   resulted in 90% of county residents receiving vaccinations by the end of August 2022.  *Id.* ¶ 26.

7   These efforts also correlated closely to the infection and mortality rates for COVID moderating

8   substantially in the summer of 2022.  As a result, in September 2022 the County was able to modify

9   the vaccination policy to permit employees exempt from the vaccination requirement to work in

10  high-risk roles with certain safeguards, and accordingly, the County's Public Health Officer

11  rescinded her prior COVID health orders.  *Id.* ¶ 21-26; Doyle Decl. ¶ 16.

12  **B.     THIS LAWSUIT**

13         Plaintiffs UnifySCC, Tom Davis, and Maria Ramirez filed this lawsuit in 2022, alleging that

14  the County's August 5, 2021 vaccination policy violated their First Amendment and other rights by

15  not adequately accommodating their religious objections to getting vaccinated.  *See* ECF No. 44 at 6.

16  Plaintiffs moved for a preliminary injunction.  The Court examined the County's vaccination

17  requirements in detail.  After doing so, the Court rejected Plaintiffs' broad challenges to the

18  requirements, but found problematic the County's stated intent to follow California and federal

19  disability protection requirements in job transfer accommodations.  The Court therefore granted-in-

20  part Plaintiffs' motion on June 30, 2022, and enjoined the County from giving employees, who were

21  in high-risk tiers with exemptions to receiving a COVID-19 vaccine, any priority consideration for

22  vacant County positions based on the type of exemption (i.e., medical or religious).  *See id.* at 23.

23  **C.     DEVELOPMENTS SINCE THE COURT'S PRELIMINARY INJUNCTION ORDER**

24         1.      The County Promptly Complied with the Court's Order

25         The County complied with the Court's June 30, 2022 preliminary injunction ("P.I.") order by

26  instructing its employees responsible for assisting exempt employees with job placements to not give

27  any exempt employee priority consideration.  Doyle Decl. ¶ 15; *see also* Mot. at 6, 20 (admitting that

28  the County treated all employees equally after Court's injunction).

                                             4

<u>2.</u>     <u>In Practice, the County Treated All Exempt Employees Equally</u>

The County offered a variety of accommodations to employees with medical and religious exemptions to the County's August 5, 2021 vaccination requirement.  The accommodations included administrative leave (with permitted use of available leave banks), while the County worked with them to determine if reassignments or transfers were possible.  *See* ECF No. 44 at 4.  Prior to the Court's P.I. order, exempt employees with disability or medical exemptions were told that they may be entitled to "priority consideration" for vacant positions consistent with the Americans with Disabilities Act and the California Fair Employment and Housing Act.

Since the Court's P.I. Order, the County provided extensive discovery on its job placement efforts.  The discovery includes data showing all job placements and modifications the County made for exempt employees, as well as thousands of pages of communications with individual employees regarding exemption requests and job placement efforts.  *See* Anderson Decl. ¶¶ 2-3.

The discovery reveals that, in practice, the County did *not* provide preferential treatment to any employee based on the type of exemption, either before or after the Court's P.I. ruling.  *See* Ex. 20 (Doyle Dep. Tr.) at 90:9-91:18, 103:18-25, 126:2-21.  Instead, the County worked with *all* interested exempt employees to find new jobs, and treated them all the same for purposes of matching them with vacant positions.  *See id.*  Ultimately, the County provided job placement or modification accommodations to 20 exempt employees.  *See* Doyle Decl. ¶ 14 & Ex. 9 (spreadsheet).  Of those 20 employees, four had medical/disability exemptions, while sixteen had religious exemptions.  *See id.*  No religious exempt employee lost out on a job, placement assistance, or any other opportunity due to preferential treatment given to other exempt employees.  In other words, the County's intention of following state and federal law by giving priority to certain employees ***did not in practice*** disadvantage religious exempt employees at all.

Plaintiffs misleadingly avoid mentioning this data in their motion.  And they do not identify even a single proposed class member who allegedly lost out on a reassignment or transfer opportunity due to the County giving medically-exempt employees preferential treatment.  In short, the factual record has developed well beyond the record available at the preliminary injunction stage, and shows that in practice the County gave all exempt employees equal accommodations.  For

1   example, Plaintiffs' complaint highlights an email from a County employee stating that "[o]nly

2   medical is part of Reasonable Accommodation and you would work directly with EOD."  ECF No.

3   55-5 at 2.  However, the employee in the highlighted email was granted a job modification and

4   returned to work.  *See* Doyle Decl., Ex. 9 (spreadsheet) at 32775, row 1.

5           3.      The County Relaxed the Vaccination Health Orders and Vaccination Requirement as

6                   the Pandemic Subsided

7           As pandemic subsided, the County relaxed and then lifted its COVID-19 health orders.

8   Rudman Decl. ¶¶ 21-36.  The County ended its policy of placing exempt employees in high-risk

9   roles on leave on September 22, 2022.  Doyle Decl. ¶ 16, Ex. 10.  As a result, Plaintiffs' requests for

10  injunctive relief are moot.

11  **D.      THE PROPOSED CLASS**

12          The proposed class consists of approximately 463 County employees who received religious

13  exemptions to the County's vaccine requirement.  Of this proposed class, 260 worked in health care

14  (e.g., at Valley Medical Center), 158 worked in custodial settings (e.g., for the Sheriff), 22 worked

15  for social services, and 17 worked in the County's Facilities and Fleets Department.  Over half (246)

16  decided to vaccinate after initially obtaining an exemption.  A significant number (111) left County

17  employment due to retirement, resignation, or other reasons.

18          The proposed class members vary widely in other respects as well.  Nearly half of the

19  proposed class members never went on leave, and among those that did, the duration, type, and

20  reasons for leave varied widely.  *See* Volk Decl. ¶¶ 12-17.  Other proposed class members never

21  sought, or declined, job transfers to lower-risk positions.  *See, e.g.*, Fisk Decl. ¶¶ 8-9 (explaining that

22  Plaintiffs' declarant Nguyen declined offers to work in lower-risk positions); Grumbos Decl. ¶¶ 7,

23  12 (explaining that Plaintiffs' declarants Luna and Valle never sought any lower-risk positions);

24  ECF No. 44 at 6 (explaining that plaintiff "Ramirez never applied for or sought any low- or

25  intermediate-risk positions in the County").  Still other proposed class members sought and/or

26  obtained employment outside the County while on administrative leave.  *See, e.g.*, Anderson Decl.,

27  Ex. 21 (interrogatory responses) at 9-10 (showing that Plaintiff Baluyut secured a job offer from

28  Stanford while on leave and Plaintiff Davis took another job).  Some proposed class members only

1 sought religious exemptions after failing to secure medical exemptions, or indicated willingness to

2 become vaccinated based on conditions unrelated to religious beliefs, which raises significant

3 questions about relevance of their religious beliefs to the vaccine requirement and its

4 implementation.  *See id.,* Ex. 10 (Luna Dep. Tr.) at 17:12-18:2; *id.,* Ex. 8 (Valle Dep. Tr.) at 23:25-

5 25:3; *id.,* Ex. 16.

6 **E.     THE PROPOSED CLASS REPRESENTATIVES**

7          The proposed class representatives are Tom Davis, Elizabeth Ramirez, and Elizabeth

8 Baluyut.  The Court's P.I. order describes Mr. Davis as an HVAC/R mechanic who spends 58% of

9 his time in high-risk facilities and Ms. Ramirez as a Valley Medical Center nurse who works with

10 vulnerable patients.  *See* ECF No. 44 at 5-6.  Both Mr. Davis and Ms. Ramirez obtained employment

11 outside the County.  Mr. Davis went to work for his former employer Pacific Coast Trane Controls

12 in June 2022, but did not resign from County employment until February 2023.  Anderson Decl., Ex.

13 21 (interrogatory responses) at 9.  Ms. Ramirez applied for and was offered jobs at HCA Healthcare

14 Regional Medical Center, Stanford Health Care, and Kaiser.  *Id.* at 10.  She accepted and worked for

15 two of those employers before resuming employment with the County.  *Id.*

16         Elizabeth Baluyut is a nurse who joined as a plaintiff in this lawsuit after the Court's P.I.

17 order.  Ms. Baluyut works with newborn babies and their mothers in the Birth Center at O'Connor

18 Hospital.  Ms. Baluyut got vaccinated against COVID-19, but then sought a religious exemption

19 against obtaining a booster.  Baluyut Decl. ¶ 5.  Ms. Baluyut only applied for one position with the

20 County that was not in the high-risk tier, and did not apply for any jobs outside the County.

21 Anderson Decl., Ex. 21 (interrogatory responses) at 10.

22                              **III.     LEGAL STANDARDS**

23 **A.     CLASS CERTIFICATION**

24         Plaintiffs must first demonstrate that "(1) the class is so numerous that joinder of all members

25 is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or

26 defenses of the representative parties are typical of the claims or defenses of the class; and (4) the

27 representative parties will fairly and adequately protect the interests of the class."  Fed. R. Civ. P.

28 23(a); *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 345 (2011).

1    The proposed class must also satisfy Rule 23(b).  Here, Plaintiffs invoke Rules 23(b)(1)(A)

2    and (b)(3).  The former rule requires showing that "prosecuting separate actions by or against

3    individual class members would create a risk of: (A) inconsistent or varying adjudications with

4    respect to individual class members that would establish incompatible standards of conduct for the

5    party opposing the class."  The latter rule requires showing that "questions of law or fact common to

6    class members predominate over any questions affecting only individual members, and that a class

7    action is superior to other available methods for fairly and efficiently adjudicating the controversy."

8    "Rule 23 does not set forth a mere pleading standard.  A party seeking class certification

9    must affirmatively demonstrate his compliance with the Rule—that is, he must be prepared to prove

10   that there are in fact sufficiently numerous parties, common questions of law or fact, etc."  *Wal-Mart*

11   *Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Olean Wholesale Grocery Coop., Inc. v. Bumble*

12   *Bee Foods LLC*, 31 F.4th 651, 665 (9th Cir. 2022) ("[P]laintiffs must prove the facts necessary to

13   carry the burden of establishing that the prerequisites of Rule 23 are satisfied by a preponderance of

14   the evidence."); *Britton v. Servicelink Field Servs., LLC*, No. 2:18-CV-0041-TOR, 2019 WL

15   3400683, at *4 (E.D. Wash. July 26, 2019) ("at the certification stage, the [plaintiff] cannot rely on

16   the pleadings.").  The trial court must be satisfied, "after a rigorous analysis," that the prerequisites

17   of Rule 23 are met.  *Wal-Mart*, 564 U.S. at 350; *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)

18   ("The same analytical principles govern Rule 23(b).").  Frequently that "rigorous analysis will entail

19   some overlap with the merits of the plaintiff's underlying claim."  *Id.*

20   **B.    DEFERENCE TO PUBLIC HEALTH OFFICIALS**

21   The judiciary has long recognized that "legislative authority must be especially broad," and

22   judicial review especially deferential, in dangerous public health emergencies: "When actions are

23   undertaken during a time of great uncertainty with a novel disease, 'medical uncertainties afford

24   little basis for judicial responses in absolute terms' and that legislative authority 'must be especially

25   broad' in 'areas fraught with medical and scientific uncertainties.'"  *Seaplane Adventures, LLC v.*

26   *Cnty. of Marin*, 71 F.4th 724, 726, 730–31 (9th Cir. 2023) (citation omitted).  Courts should not

27   second guess, with the benefit of hindsight, difficult choices that local governments made to protect

28   the public health during a raging crisis.  *Id.* at 730-31 ("With the benefit of hindsight and knowledge

8

1  of facts discovered by scientists, doctors, and health officials after the crisis had subsided, we

2  recognize that perhaps state and local governments could have acted differently, but health officials

3  do not need to act perfectly to establish a rational basis. The passage of time and the resulting

4  receding of a crisis does not make us, as courts, competent to second guess what the best avenue of

5  action was for a state or local government when the crisis was raging, especially in light of the long-

6  established standard for rational basis review.").

7  **IV.    ARGUMENT**

8  The Court should deny Plaintiffs' motion.  Plaintiffs fail to satisfy Rule 23(a), because

9  Plaintiffs fail to identify common questions capable of generating common answers apt to drive

10  resolution of this litigation.  Plaintiffs fail to satisfy Rule 23(b)(1)(A), because there is no material

11  risk of injunctive or declaratory "whipsawing" between inconsistent judicial decisions.  Plaintiffs

12  also fail to satisfy Rule 23(b)(3), because individualized questions predominate.

13  **A.    PLAINTIFFS FAIL TO SATISFY RULE 23(A)**

14  "What matters to class certification ... is not the raising of common 'questions'—even in

15  droves—but rather, the capacity of a class-wide proceeding to generate common answers apt to drive

16  the resolution of the litigation.  Dissimilarities within the proposed class are what have the potential

17  to impede the generation of common answers."  *Wal-Mart*, 564 U.S. at 350.  Importantly, the

18  common answers must be the same for *all* class members.  Class actions do not permit arriving at

19  "some 'average' for purposes of liability."  *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 268

20  F.R.D. 604, 612 (N.D. Cal. 2010) (rejecting attempt to use random sampling and representative

21  testimony to avert individualized inquiries, finding that "Plaintiff has not identified a single case in

22  which a court certified an overbroad class that included both injured and uninjured parties."); *Pryor*

23  *v. Aerotek Sci.*, LLC, 278 F.R.D. 516, 535 (C.D. Cal. 2011) (similar).

24  Here, Plaintiffs propose five common questions of law and fact.  Mot. at 9.  None of the

25  questions, however, will generate a common answer apt to drive resolution of this litigation.

26  Plaintiffs' first proposed common question is "[w]hether Defendants violated Plaintiffs' right

27  to free exercise and equal protection of the law by prioritizing medical exemptions over religious

28  exemptions in high-risk settings."  *Id.*  This question cannot generate a common answer.  Plaintiffs

9

1   argue that the County prioritized medical- over religious-exempted personnel in job transfers. *Id.* at

2   17.  But as explained above, many proposed class members *either never sought, or refused, a job*

3   *transfer.  See supra*, II.C.2; Doyle Decl. ¶ 11; ECF No. 44 at 4; Volk Decl. ¶ 12.  These proposed

4   class members cannot prove a constitutional violation.  Other proposed class members received job

5   transfers or modifications allowing them to continue working.  *See supra*, II.C.2; Doyle Decl. ¶ 14 &

6   Ex. 9 (spreadsheet).  Plaintiffs do not explain how such proposed class members could prove a

7   constitutional violation based on an alleged lack of preferential treatment.  And *all* of the proposed

8   class members in practice received the same diligent job transfer assistance as the County provided

9   equally to medical- and religious-exempted personnel.  *See supra*, II.C.2; Anderson Decl., Ex. 20

10  (Doyle Dep. Tr.) at 90:9-91:18, 103:18-25, 126:2-21.  To prove otherwise, an individual plaintiff

11  would need to establish that he or she sought a job transfer and did not secure it because of

12  preferential treatment given to another employee.  This analysis requires a highly individualized

13  inquiry that depends on the individual's job qualifications, relevant open positions, and the job

14  transfer assistance that the particular person received.  Tellingly, Plaintiffs do not identify even a

15  single proposed class member who was personally disadvantaged due to the purported "preferential

16  treatment"—much less "affirmatively demonstrate" that this proposed question will generate a

17  common answer for *all* proposed class members.  *Wal-Mart*, 564 U.S. at 350.  Plaintiffs' purported

18  evidence of preferential treatment is flimsy at best.  Plaintiffs rely on, for example, Gondeiro Decl.,

19  Ex. K at 93:20-25, 94:1-3, 126:2-7, which merely states that prioritizing employees with medical

20  exemptions "may have come up" in conversations, but "in reality…no employee was given a job

21  over another employee based on that."  *See id.*, Ex. K at 126:8-9.  Thus, Plaintiffs' first proposed

22  question is not suitable for classwide resolution.

23          Plaintiffs' second proposed common question is "[w]hether Defendants' Risk Tier System

24  violated the Free Exercise Clause and Equal Protection Clause because it relegated Plaintiffs and the

25  Class members to unpaid leave but allowed some unvaccinated or non-boosted employees to

26  continue to work."  Mot. at 9.  Plaintiffs intend to prove that the Risk Tier system was irrational, and

27  therefore unconstitutional, by "demonstrat[ing] that certain job settings Defendants classified as

28  'high risk' do not pose a greater risk of COVID-19 transmission than jobs in lower-risk tiers, thereby

undermining the legitimacy of the entire Risk Tier System." *Id.* at 18.  For example, Plaintiffs present declarations from an HVAC/R mechanic (Daniel Kacir), a roofer (Jorge Alvarez) and a Pretrial Services Officer (Melanie Nguyen).  *Id.* at 17-18.  Apparently, Plaintiffs contend these three individuals should have been classified as mid- or low-risk, and that as a result, the County could not have constitutionally classified *any* of the 463 religious-exempted employees as high-risk, including any of the 260 health care employees or any of the 158 correctional officers.  *See id.* at 18.  Also, Mr. Kacir is not even a putative class member, as he received a medical exemption and not a religious exemption.  Draper Decl. ¶ 6.  He was, however, treated the same as named Plaintiff Davis.

Plaintiffs' challenge to the Risk Tier System suffers from multiple problems.  To begin with, Plaintiffs' approach relies on highly individualized inquiries.  By their own admission, Plaintiffs intend to dissect the job duties, interactions, and risk profiles of select employees such as HVAC/R mechanic Kacir, roofer Alvarez, and Pretrial Services Officer Nguyen, to prove that they were misclassified as high-risk.  But whether these individuals' disparate job duties brought them into high-risk facilities or exposed vulnerable populations to rationally be classified as high-risk is a quintessentially individualized inquiry.  *See* Draper Decl. ¶¶ 15-20; Fisk Decl. ¶ 5.

In addition, Plaintiffs' effort to rely on a few allegedly representative examples to prove their case for all 463 proposed class members simply makes no sense, and is legally impermissible.  For example, Plaintiffs cannot possibly prove that a nurse working with vulnerable patients on a daily basis in a hospital (such as Plaintiffs Ramirez and Baluyut) was unconstitutionally classified as high-risk, because a roofer was misclassified as high-risk.  Plaintiffs make no attempt to explain the logic of this approach.  And even if a roofer could be deemed representative of 260 health care workers (an obviously flawed proposition), Plaintiffs may not rely on allegedly representative testimony to avert individualized inquiries.  *See Wells Fargo*, 268 F.R.D. at 612.

Plaintiffs' assertion that the County allowed two high-risk employees (Adam Valle and James Luna) to continue working also fails to support class certification.  Mot. at 17 (citing Gondeiro Decl., Exs. B-C).  Mr. Valle only worked unvaccinated for a three-week period, in a special assignment helping investigators prepare for a Personnel Board hearing, during which time he was prohibited from entering correctional facilities, while Mr. Luna worked for a total of five

1    days after returning from an extending disability leave before retiring.  *See* Grumbos Decl. ¶¶ 9, 14.

2    These two purported examples of deviations from the County's Risk Tier System therefore require

3    individualized inquiries.  Moreover, despite taking extensive discovery, Plaintiffs present only these

4    two purported examples, and no evidence of any significant deviation from the County's vaccination

5    requirements.  It is absurd to suggest that two claimed exceptions to a policy affecting tens of

6    thousands of employees could possibly prove that the County's vaccination requirement as a whole

7    was unconstitutionally irrational—particularly considering the fact that courts cannot, with the

8    benefit of hindsight, demand perfection during a public health emergency.  *See Seaplane*, 71 F.4th at

9    726, 730–31.  Plaintiffs' attempt to tease constitutional violations out of these two purported

10   exceptions is all the more incredible because both Mr. Valle and Mr. Luna had religious exemptions

11   to the County's vaccination requirement, which means that they *benefitted* from any purported

12   deviations from County policy, and experienced no discrimination due to their religious beliefs.

13   Thus, even if Plaintiffs could show that Mr. Valle's and Mr. Luna's brief assignments deviated from

14   County policy, those examples would undermine rather than support Plaintiffs' claims.

15         Plaintiff's third proposed common question—"[w]hether the County's religious exemption

16   and/or accommodation procedure…is [] subject to strict scrutiny"—is a preliminary legal

17   determination that would not resolve a single claim of a single class member, much less "drive the

18   resolution of the litigation" by resolving claims on a classwide basis.  *Wal-Mart*, 564 U.S. at 350;

19   *see also Dennis F. v. Aetna Life Ins.*, No. 12-CV-02819-SC, 2013 WL 5377144, at *4 (N.D. Cal.

20   Sept. 25, 2013) (denying class certification because a classwide proceeding would not generate

21   common answers); *Ventures Edge Legal PLLC v. GoDaddy.com LLC*, No. CV-15-02291-PHX-

22   GMS, 2018 WL 619723, at *5 (D. Ariz. Jan. 30, 2018) (denying class certification, finding that

23   proposed common questions insufficient to show statutory violation).  Plaintiffs provide no

24   explanation for why the Court should invoke the cumbersome and complex class action process

25   merely to answer a preliminary question about the appropriate scrutiny level, particularly where the

26   Court has already found that the scrutiny level is unlikely to matter.  *See* ECF No. 44 at 13 ("[T]he

27   Court also finds that it is more likely than not that the Mandate would survive strict scrutiny….").

28   / /

Plaintiffs' fourth proposed common question is "[w]hether Defendants provided Individual Plaintiffs and the Class members with reasonable accommodation as required under FEHA and Title VII." Mot. at 10. This proposed common question again raises fact-specific, individualized inquiries. As the Ninth Circuit has recognized, "[d]etermining whether a proposed accommodation (medical leave in this case) is reasonable, including whether it imposes an undue hardship on the employer, requires a fact-specific, individualized inquiry." *Nunes v. Wal-Mart Stores, Inc.*, 164 F.3d 1243, 1247 (9th Cir. 1999); *U.S. Equal Emp. Opportunity Comm'n v. MJC, Inc.*, 400 F. Supp. 3d 1023, 1036 (D. Haw. 2019) (same). An employee's specific job environment and the length of leave provided are among the many facts that courts consider when assessing whether an accommodation was reasonable. *See id.*; *Hanson v. Lucky Stores, Inc.*, 74 Cal.App.4th 215, 226 (1999) ("We hold that a finite leave can be a reasonable accommodation under FEHA, provided it is likely that at the end of the leave, the employee would be able to perform his or her duties."); *see also Groff v. DeJoy*, 143 S.Ct. 2279, 2294, 2297 (2023) (emphasizing that determining if an accommodation is reasonable is a "fact-specific inquiry" that requires a "context-specific application"). Here, the proposed class members held a variety of different jobs (e.g., nurse, roofer), reacted in a variety of different ways to the County's vaccination requirement (e.g., over half got vaccinated), underwent a variety of different employment actions (e.g., 111 left the County due to retirement, resignation, and other reasons), and were given a variety of different accommodations during the proposed class period (e.g., job transfers, temporary special assignments, maternity leave, sick leave, administrative leave) for a variety of different durations (e.g., from one week up to nine months). There is no sound way to assess the reasonableness of a multitude of different accommodations for all 463 different employees in one fell swoop, making this issue inappropriate for class-based adjudication.

For example, several social workers transitioned to office work and became vaccinated. *See* Doyle Decl. ¶14 & Ex. 9 (spreadsheet). Plaintiff Elizabeth Ramirez, a hospital nurse, "never applied for or sought any low- or intermediate-risk positions in the County." ECF No. 44 at 6. Melanie Nguyen, a Pretrial Services Officer, refused to accept low- or medium-risk positions offered to her. *See* Fisk Decl. ¶ 8. Adam Valle, a Sheriff's deputy, received a three-week paid special assignment. *See* Grumbos Decl. ¶ 14; Valle Decl. ¶ 5; Ex. Anderson Decl., Ex. 8 (Valle Dep. Tr.) at 26:14-29:9.

13

1    James Luna, a Sheriff's deputy, was on paid disability leave, unrelated to his vaccination status, for

2    almost the entire class period, and then retired.  *See* Grumbos Decl. ¶ 14; Luna Decl. ¶ 2.  These

3    individual circumstances matter.

4         Plaintiffs' fifth and final proposed common question is "[w]hether Defendants violated the

5    Establishment Clause by demonstrating hostility towards religion."  This is an ill-formed question

6    unsupported by any competent theory of liability or evidence.  Plaintiffs assert that the County

7    "blatantly discriminated against employees who requested a religious exemption" by not transferring

8    or reassigning them, "as they did with medically exempt employees."  Mot. at 20-21.  Plaintiffs cite

9    no evidence in support of this spurious assertion.  Plaintiffs also omit directly relevant contrary

10   evidence, including the facts that:  1) the County provided a religious exemption to its vaccination

11   requirement; 2) the County granted all requested religious exemptions where an employee provided

12   any statement of religious belief; 3) the County dedicated human resources professionals to work

13   with all interested exempted employees to find alternative positions: and 4) the County placed more

14   religious- than medical-exempted personnel in alternative positions.  *See* Doyle Decl. ¶¶ 9-11, 14; &

15   Ex. 9 (spreadsheet); Anderson Decl., Ex. 20 (Doyle Dep. Tr.) at 90:9-91:18, 103:18-25, 126:2-21.

16        Plaintiffs next assert that they were not offered accommodations such as N95 masks, Mot. at

17   20, but the lack of those accommodations applied equally to *all* exempt high-risk employees—both

18   medical and religious.  Doyle Decl. ¶ 8 & Ex. 2 at 3.  It had nothing to do with religion, and cannot

19   demonstrate "hostility."  Finally, Plaintiffs allege that to comply with the Court's P.I. order, the

20   County treated all employees equally.  Somehow, according to Plaintiffs, the County's prompt

21   compliance with the Court's injunction and resulting *equal* treatment of all employees demonstrates

22   hostility to religion.  The logic of this argument is inscrutable.  The Court should not certify a class

23   to allow Plaintiffs to grasp at straws.  *See Wal-Mart*, 564 U.S. at 350 ("rigorous analysis" required).

24   That is particularly true for a claim based on alleged hostility to religion, which courts closely

25   scrutinize at an "early stage."  *See Vasquez v. Los Angeles Cnty.*, 487 F.3d 1246, 1255 (9th Cir.

26   2007) (endorsing rejection of Establishment Clause claim at early stage of litigation, stating that

27   "[w]hile we must 'distinguish a sham secular purpose from a sincere one,' we should also be

28   'reluctant to attribute unconstitutional motives to the [government]'").

Defendants' Opposition to Plaintiffs'                                            22-CV-01019 BLF
Motion for Class Certification

Furthermore, "[e]ven statements exhibiting some hostility to religion do not violate the Establishment Clause if the government conduct at issue has a secular purpose, does not have as its principal or primary effect inhibiting religion and does not foster excessive government entanglement with religion." *C.F. ex rel. Farnan v. Capistrano Unified Sch. Dist.*, 654 F.3d 975, 985–86 (9th Cir. 2011). Plaintiffs identify no argument or evidence for how the County's vaccination requirement allegedly fails that test. The vaccination requirement undeniably had a secular purpose—to prevent illness and death from COVID-19—which it succeeded in doing. *See* Rudman Decl. ¶ 30. In short, this is not a case about hostility to religion, and the Court should not certify a class to allow Plaintiffs to chase spurious assertions.

Thus, Plaintiffs have failed to meet their burden of identifying common questions capable of generating common answers apt to drive resolution of this litigation. The Court should deny Plaintiffs' motion for this reason alone.

**B.   PLAINTIFFS FAIL TO SATISFY RULE 23(b)(1)(A)**

Plaintiffs seek certification under Rule 23(b)(1)(A). Mot. at 13. Rule 23(b)(1)(A) requires showing that "prosecuting separate actions by or against individual class members would create a risk of: (A) inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." As Plaintiffs acknowledge, the Rule's purpose is to "avoid injunctive or declaratory 'whipsawing' where different courts require the same defendant to abide by incompatible or contradictory rulings." *Doster v. Kendall*, 342 F.R.D. 117, 127 (S.D. Ohio 2022).

Plaintiffs argue that "[s]imilar claims may be brought in another court" in addition to this Court, and the two courts may "establish incompatible standards of conduct." *Id.* Plaintiffs are incorrect. There is no material risk of injunctive or declaratory whipsawing for two reasons.

First, Plaintiffs' request for injunctive relief is moot because the challenged health orders are no longer in effect. As explained above, in September 2022 the County began permitting exempted employees to work in high-risk roles with certain safeguards, and the County's Public Health Officer lifted her prior COVID health orders. Rudman Decl. ¶¶ 21-24. Plaintiffs acknowledge this fact by defining their proposed "Class Period" to end on September 27, 2022. *See* Mot. at 1. The County

Defendants' Opposition to Plaintiffs'
Motion for Class Certification

1  therefore does not face any prospect of any court enjoining its vaccination measures, much less the

2  risk of two courts issuing contradictory injunctions.  *See, e.g.*, *Zinser v. Accufix Research Institute,*

3  *Inc.*, 253 F.3d 1180 (9th Cir. 2001) (certification under Rule 23(b)(1)(A) inappropriate in damages-

4  focused cases); *Daskalea v. Washington Humane Soc.*, 275 F.R.D. 346, 365 (D.D.C. 2011) (denying

5  certification under Rule 23(b)(1)(A) where "claims for forward-looking declaratory and injunctive

6  relief are no longer at issue in this action").

7          Second, Plaintiffs' assertion that "[s]imilar claims may be brought in another court" does not

8  make sense.  This case involves a local, not a nationwide, proposed class.  Any claim would need to

9  be brought in state or federal court in this County.  Any case with a federal claim would be

10 removable to this Court, and any case lacking a federal claim would not involve the federal claims

11 upon which Plaintiffs rely for their requests for injunctive relief (i.e., First and Fourteenth

12 Amendment claims).  Thus, even if Plaintiffs' request for injunctive relief were not moot, Plaintiffs

13 fail to meet their burden of proving that there is a material risk of inconsistent injunctions.

14         Plaintiffs rely on *Doster v. Kendall*, 342 F.R.D. 117, 121-22 (S.D. Ohio 2022), but *Doster* is

15 inapt.  That case, unlike this one, concerned a nationwide class, and the requested relief focused

16 primarily on prospective injunctive relief.  Accordingly, Plaintiffs fail to show that Rule 23(b)(1)(A)

17 applies to this damages-focused, local, one-County case.

18 **C.     PLAINTIFFS FAIL TO SATISFY RULE 23(b)(3)**

19         Plaintiffs also seek certification under Rule 23(b)(3).  Rule 23(b)(3) contains additional

20 requirements that are "even more demanding than Rule 23(a)."  *See Comcast Corp. v. Behrend*, 569

21 U.S. 27, 33-34 (2013).  The rule requires plaintiffs to "affirmatively demonstrate" through

22 "evidentiary proof" that "the questions of law or fact common to class members predominate over

23 any questions affecting only individual members."  *Id.*  Doing so requires, among other things,

24 "establishing that damages are capable of measurement on a classwide basis," by presenting a

25 classwide damages model consistent with plaintiffs' liability theory.  *Id.*

26          Here, the Court should deny certification under Rule 23(b)(3), because common questions of

27 law and fact do not predominate, and Plaintiff's damages model does not establish that damages can

28 be measured across the entire class, consistent with Plaintiffs' liability case.

1.     Common Questions of Law and Fact Do Not Predominate

a.     *Free Exercise Clause*

The Free Exercise Clause states that Congress may not "prohibit[] the free exercise [of religion]." U.S. Const. amend. I. If a rule burdening sincere religious practice is both neutral and generally applicable, it must only be "rationally related to a legitimate government purpose." *Stormans, Inc. v. Wiseman*, 794 F.3d 1064, 1084 (9th Cir. 2015). If such a rule is not neutral or generally applicable, it must be "narrowly tailored" to serve a "compelling" state interest. *Kennedy v. Bremerton Sch. Dist.*, 142 S.Ct. 2407, 2421 (2022).

Here, Plaintiffs allege that the County's Risk Tier System and "practice of giving preferential consideration to those with disability and medical exemptions" violated the Free Exercise Clause. Mot. at 15-18. These two theories of liability mirror Plaintiffs' first and second proposed common questions. As explained above, both of these questions involve highly individualized inquiries. *See supra*, section IV.A. In brief, Plaintiffs' attempt to prove that 463 employees (including 260 health care professionals) were unconstitutionally classified as holding high-risk positions, based on a few examples of allegedly misclassified employees, depends on highly individualized inquiries and illogical leaps of logic. Plaintiffs also fail to prove that common questions predominate when many proposed class members declined to seek job transfers, many sought and received job transfers or modifications, and still others received extensive job transfer assistance but ultimately lacked qualifications for relevant open positions. Thus, Plaintiffs have not "affirmatively demonstrate[d]" through "evidentiary proof" that common questions predominate. *See Comcast*, 569 U.S. at 33-34.

Plaintiffs' vague allusion to "evidence before the Court" during the preliminary injunction phase of this case fails to cure that defect. *See* Mot. at 15-16 (citing ECF No. 44 at 9-15). It is procedurally improper for Plaintiffs to incorporate by reference arguments and evidence presented to the Court in a different motion. *See* Civil Local Rule 7-2(b) (requiring that motion contain evidence and argument in "one filed document"); *see, e.g.*, *Kavianpour v. Bd. of Regents of Univ. Sys. of Georgia*, No. 1:20-CV-152-MLB, 2023 WL 2733381, at *4 (N.D. Ga. Mar. 31, 2023) (ignoring "arguments—even relevant ones—raised in connection with a different motion"). The Court should therefore decline to comb through 18-month-old preliminary injunction papers to determine whether

17

1    some arguments or evidence in them could support Plaintiffs' current motion.

2           Regardless, the portion of the Court's P.I. order that Plaintiffs allude to dealt largely with the

3    appropriate level of scrutiny to give the County's vaccination requirement. *See* ECF No. 44 at 9-12.

4    As explained above, that was a preliminary legal question that will not resolve a single claim for a

5    single class member, much less drive resolution of this litigation. *See supra*, section IV.A.  The

6    remainder of the Court's P.I. order that Plaintiffs allude to found that the County's COVID-19

7    vaccination requirement is rationally related to a legitimate government purpose. *See* ECF No. 44 at

8    13-15.  To assess that issue, the Court considered evidence showing that COVID-19 vaccines

9    "reduce the chances of contracting and spreading the virus, or of being afflicted with serious illness

10   or death from COVID-19 if the virus is contracted." *See id.*  The Court examined that issue because,

11   in seeking a preliminary injunction, Plaintiffs raised a broad challenge to the efficacy of COVID-19

12   vaccines generally. *See, e.g.*, ECF No. 32 at 7-8 (relying on expert to argue that vaccines "provide

13   only short-lasting protection against subsequent infection").

14          In their motion for class certification, however, Plaintiffs do not make any such argument.

15   *See generally* Mot. at 7-18.  Plaintiffs do not re-argue that COVID-19 vaccines are ineffective.  Nor

16   do Plaintiffs propose a common question directed at the efficacy of COVID-19 vaccines. *See id.* at

17   9-11.  In fact, Plaintiffs only mention Dr. Bhattacharya's theories briefly in the background section

18   of their motion, but never develop an argument based on them, or even mention his name. *See id.* at

19   4.  As a result, the broad-based attacks Plaintiffs made on vaccine efficacy during the preliminary

20   injunction phase of this case are irrelevant to Plaintiffs' motion for class certification.  This case has

21   moved past that phase.  The Court must resolve Plaintiffs' motion based on the legal theories

22   presented in it, not based on theories Plaintiffs could have, but did not, pursue. *See Cummings v.*

23   *Starbucks Corp.*, No. CV 12-06345-MWF FFMX, 2014 WL 1379119, at *5 (C.D. Cal. Mar. 24,

24   2014) (The "Court is required to determine this Motion on the basis of the plaintiff's legal theory.");

25   *Frausto v. Bank of Am., Nat'l Ass'n*, No. 18-CV-01202-LB, 2021 WL 2476902, at *3 (N.D. Cal.

26   June 17, 2021) (similar).  Individualized issues therefore predominate for Plaintiffs' Free Exercise

27   claim.

28   / /

1                        **b.**      *FEHA*

2        Individualized issues also predominate for Plaintiffs' FEHA claim.  Plaintiffs allege that the

3 County violated FEHA by "only placing employees with medical exemptions, not religious

4 exemptions."  Mot. at 18.  This allegation is, however, demonstrably false.  The County placed many

5 more employees with religious exemptions than employees with medical exemptions.  *See* Doyle

6 Decl., Ex. 9 (spreadsheet).  The County worked with *all* interested exempt employees to find new

7 jobs, and treated them all the same for purposes of matching them with vacant positions.  *See*

8 Anderson Decl., Ex. 20 (Doyle Dep. Tr.) at 90:9-91:18, 103:18-25, 126:2-21.  Plaintiffs cannot meet

9 their burden of "affirmatively demonstrat[ing]" entitlement to class certification "with evidentiary

10 proof" by misleadingly omitting directly relevant evidence.  *See Comcast*, 569 U.S. at 33-34.

11 Plaintiffs' reliance on a single poorly-worded email sent to a single employee does not change those

12 facts, including because that employee in fact received a job modification.  *See* Doyle Decl., Ex. 9

13 (spreadsheet) at 32775, row 1.  Moreover, as explained above, any claim that an individual plaintiff

14 was disadvantaged by supposed "preferential treatment" given to other employees depends on highly

15 individualized issues, including whether the employee sought a job transfer, whether the employee

16 received a job transfer or modification, and what job transfer assistance the County provided to that

17 specific employee.  Such issues cannot be decided collectively for 463 different employees.

18        Plaintiffs also argue that they will rely on "common evidence that the County failed to offer

19 reasonable accommodations" to the 463 proposed class members.  Mot. at 19.  But as explained

20 above with respect to Plaintiffs' fourth proposed common question, "[d]etermining whether a

21 proposed accommodation (medical leave in this case) is reasonable, including whether it imposes an

22 undue hardship on the employer, requires a fact-specific, individualized inquiry."  *Nunes*, 164 F.3d

23 at 1247; *see supra*, section IV.A.  Moreover, Plaintiffs admit that the County treated all employees

24 equally after the Court's P.I. ruling.  *See* Mot. at 6 (admitting that "[a]fter the Court issued its

25 preliminary injunction, the County responded by no longer providing transfers or reassignments to

26 any employees with exemptions—religious or medical.  Instead, all unvaccinated employees with

27 exemptions were required to apply for a new position.").  This admission dooms Plaintiffs' claim

28 that the County violated FEHA after the preliminary injunction.  FEHA requires *discrimination*

1  based on religious creed—FEHA does not support a freestanding claim that a defendant did not

2  provide a reasonable accommodation.  *See* Cal. Gov't Code § 12940(a); *Wallace v. County of*

3  *Stanislaus*, 245 Cal.App.4th 109 (2016) ("An employer 'discriminates' when it treats the employee

4  differently 'because of' a factor listed in the FEHA.").

5  Finally, FEHA requires exhausting administrative remedies before filing a lawsuit.  *See*

6  *Martin v. Lockheed Missiles & Space Co.*, 29 Cal.App.4th 1718, 1724 (Cal. Ct. App. 1994).

7  Plaintiffs make no effort to show that any (much less all) proposed class members have complied

8  with this requirement.  Doing so will require individualized proof.

9  c.  *Equal Protection*

10  Plaintiffs' Equal Protection claim depends on individualized issues for the same reasons as

11  Plaintiffs' Free Exercise claim.  As Plaintiffs acknowledge, the two claims rise and fall together.  *See*

12  *Prince v. Mass.*, 321 U.S. 158, 170 (1944) ("[T]he one is but another phrasing of the other.").

13  d.  *Establishment Clause*

14  A "government act is consistent with the Establishment Clause if it: (1) has a secular

15  purpose; (2) has a principal or primary effect that neither advances nor disapproves of religion; and

16  (3) does not foster excessive governmental entanglement with religion."  *Vasquez v. Los Angeles*

17  *("LA") Cnty.*, 487 F.3d 1246, 1255 (9th Cir. 2007).  "Even statements exhibiting some hostility to

18  religion do not violate the Establishment Clause if the government conduct at issue has a secular

19  purpose, does not have as its principal or primary effect inhibiting religion and does not foster

20  excessive government entanglement with religion."  *C.F. ex rel. Farnan v. Capistrano Unified Sch.*

21  *Dist.*, 654 F.3d 975, 985–86 (9th Cir. 2011)

22  Here, Plaintiffs allege that the County violated the Establishment Clause by (i) not offering

23  job transfers to employees with religious exemptions; (ii) treating all employees equally to comply

24  with the Court's P.I. order; and (iii) demonstrating hostility to religion.  Mot. at 20-21.  As explained

25  above, however, in practice, the County treated religious- and medical-exempted personnel equally.

26  Plaintiffs cite no evidence to support their spurious assertions otherwise.  Plaintiffs also cannot prove

27  a constitutional violation based on the County's admittedly *equal* treatment of all employees—in

28  both policy and practice—to comply with the Court's injunction.  And Plaintiffs cite no evidence of

1    hostility, or show that any alleged hostility primarily inhibited religion. *See supra*, section IV.A..

2    Plaintiffs' spurious assertions and fundamentally flawed arguments come nowhere close to

3    justifying a class action.

4               e.    *Title VII*

5    Plaintiffs' arguments regarding Title VII mirror their arguments regarding FEHA.  The

6    arguments fail for the same reasons. *See supra*, section IV.C.1.b.

7    Like FEHA, Title VII prohibits employers from "discriminat[ing] against any individual with

8    respect to his compensation, terms, conditions, or privileges of employment, because of such

9    individual's…religion." *Groff*, 143 S.Ct. at 2287.  Employers must make reasonable

10   accommodations to the religious needs of employees unless doing so would work "an undue

11   hardship on the conduct of the employer's business." *Id.* at 2287-88.  Like FEHA, the reasonable

12   accommodations analysis under Title VII requires a "fact-specific inquiry" and "context-specific

13   application." *See id.* at 2294, 2297.

14   As with their FEHA claims, Plaintiffs cannot show that proposed class members—including

15   those who refused to seek job transfers, who were provided job transfers or modifications, who were

16   provided diligent job transfer assistance, or who applied for jobs for which they were not qualified—

17   were injured by the County's alleged preferential treatment of disabled employees.  And Plaintiffs'

18   assertions that the County should have offered bi-weekly testing and N95 masking relies on

19   individualized examples of two allegedly misclassified roofers and one Pretrial Services Officer.  In

20   short, Plaintiffs identify no common question that can be answered *en masse* for a diverse set of 463

21   employees, particularly for the fact-specific issue of reasonable accommodations.

22              f.    *Monell*

23   As Plaintiffs appear to acknowledge, their "*Monell* claim" is not a separate legal claim, but a

24   way to establish the County's liability for Plaintiffs' Free Exercise, Equal Protection, and

25   Establishment Clause claims. *See* Mot. at 22.  This "claim" therefore cannot justify a class action.

26   Moreover, Plaintiffs assert that they "will use common evidence to demonstrate that the

27   unlawful actions carried out by County officials, as alleged in the First through Third Causes of

28   Action, were carried out by individuals who sit at the top of their departments within the County and

21

1   who thus qualify as final policymakers under *Monell*." *Id.* But Plaintiffs do not cite any evidence in

2   support of that assertion, much less any common evidence that would apply for all 463 proposed

3   class members. In fact, County personnel who made risk tier determinations consisted of heads of

4   the County's more than 70 agencies/departments, as well as numerous individuals designated by

5   them. County employees in the Employee Services Agency and Equal Opportunity Division assisted

6   exempt employees with job transfers. It is unlikely that any of those diverse individuals—including

7   department heads—would qualify as a final policymaker under *Monell. See Mauck v. McKee*, No.

8   18-CV-04482-NC, 2019 WL 11585408, at *8 (N.D. Cal. Aug. 2, 2019) (finding County department

9   heads were not final policymakers under *Monell*). Thus, the Court should reject Plaintiffs'

10   unsupported assertions regarding their "*Monell* claim."

11        2.    <u>Plaintiffs Do Not Establish that Damages Can Be Measured Across the Entire Class,</u>

12              <u>Consistent with Plaintiffs' Liability Case</u>

13        Plaintiffs further fail to satisfy Rule 23(b)(3), because their damages models do not establish

14   that damages can be measured across the entire class, consistent with their liability case.

15        Rule 23(b)(3) requires "establishing that damages are capable of measurement on a classwide

16   basis." *Comcast*, 569 U.S. at 34. As the Supreme Court explained:

17        [A] model purporting to serve as evidence of damages … must measure only those

18        damages attributable to [plaintiff's liability] theory. If the model does not even

19        attempt to do that, it cannot possibly establish that damages are susceptible of

20        measurement across the entire class for purposes of Rule 23(b)(3). Calculations need

21        not be exact, but at the class-certification stage (as at trial), any model supporting a

22        'plaintiff's damages case must be consistent with its liability case ….'

23   *Id.* at 35. Further, Rule 23(b)(3) only permits a damages class action "if the court finds that the

24   questions of law or fact common to class members predominate over questions affecting only

25   individual members." *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1138 (9th Cir. 2022).

26        Here, Plaintiffs rely on damages models developed by Keith L. Mendes, CFA. Mr. Mendes

27   opines that the damages models can be applied on a class-wide basis in two scenarios: (a) if the fact

28   finder determines that the Risk Tier System violated the law and all Class members should have

1    been allowed to continue working ("Scenario 1"); and (b) the fact finder determines that the County

2    discriminated against class members relative to employees with medical exemptions ("Scenario 2").

3    *See* Mot. at 23.  However, Mr. Mendes' damages models do not establish that damages can be

4    measured across the entire class, consistent with Plaintiffs' liability case.  His Scenario 1 risk-tier

5    damages model ignores crucial individualized inquiries and relies on numerous unsupported

6    assumptions.  His Scenario 2 preferential-treatment damages model is a meaningless computation

7    untethered to Plaintiffs' liability theory.

8            a.      *Plaintiffs' Scenario 1 Damages Model Ignores Crucial Individualized*

9                    *Inquiries*

10           Mitigation is an "ancient principle of law" in employment cases.  *Ford Motor Co. v.*

11   *E.E.O.C.*, 458 U.S. 219, 231 (1982).  "An unemployed or underemployed claimant, like all other

12   Title VII claimants, is subject to the statutory duty to minimize damages set out in § 706(g).  This

13   duty, rooted in an ancient principle of law, requires the claimant to use reasonable diligence in

14   finding other suitable employment."  *Id.*; *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th

15   Cir. 2000); *Van v. Plant & Field Serv. Corp.*, 672 F. Supp. 1306, 1319 (C.D. Cal. 1987), *aff'd*, 872

16   F.2d 432 (9th Cir. 1989); *Kao v. Univ. of San Francisco*, 229 Cal.App.4th 437, 454 (2014) (same for

17   FEHA).

18           Here, mitigation has central and overriding importance to any potential damages.  A few

19   examples show why.  Plaintiff Tom Davis went to work for his former employer, Pacific Coast

20   Trane Controls, on June 1, 2022, but did not resign from County employment until February 2023.

21   Anderson Decl., Ex. 21 (interrogatory responses) at 9.  Plaintiff Maria Ramirez worked at two jobs

22   while on leave from the County.  *Id.*  Declarant Nguyen refused to accept alternate positions offered

23   to her.  *See* Fisk Decl. ¶ 8.  Declarants Valle and Luna declined any reassignments or transfers.  *See*

24   Grumbos Decl. ¶¶ 7, 12.  Mr. Mendes, however, failed to account for such mitigation (or failure to

25   mitigate) in his damages model.  *See* Anderson Decl., Ex. 18 (Mendes Dep. Tr.) at 63:22-23 ("Q.

26   Did you account for mitigation in your scenario one damages model?  A.  No.");  Volk Decl. ¶ 18.

27   Mitigation efforts plainly present individualized issues not amenable to classwide resolution.  *See*

28   *Mazur v. eBay Inc.*, 257 F.R.D. 563, 572 (N.D. Cal. 2009) (individualized mitigation issues defeat

Defendants' Opposition to Plaintiffs'                                                22-CV-01019 BLF
Motion for Class Certification

1    certification); *Gartin v. S & M NuTec LLC*, 245 F.R.D. 429, 441 (C.D. Cal. 2007) (similar).

2          Plaintiffs' Scenario 1 damages model also relies on fundamentally flawed assumptions.

3    Among other things, Mr. Mendes incorrectly assumes that all "voluntary" leave taken by proposed

4    class members between August 5, 2021 and September 27, 2022 was due to the County's COVID

5    vaccination requirement.  *See* Mot., Ex. V, ¶ 25 & n.27, n.35; *see also* Volk Decl. ¶ 19.  But

6    employees took leave during that *yearlong period* for numerous reasons unrelated to COVID, such

7    as vacation or sickness—a fact the model ignores.  Mr. Mendes's damages model is therefore

8    infected by fundamentally flawed assumptions, which render it unreliable.  Only individualized

9    assessments of leave usage could address this issue.

10         Accordingly, Plaintiffs' Scenario 1 damages model ignores crucial individualized inquiries,

11   which render it unable to measure damages on a classwide basis.

12               b.    *Plaintiffs' Scenario 2 Damages Model Is a Meaningless    Computation*

13                     *Untethered to Plaintiffs' Liability Theory*

14         Plaintiffs' Scenario 2 damages model is so deficient, that the Court should exclude it under

15   Rule 702.  The model makes no sense.  And it has nothing to do with Plaintiffs' liability theory.

16         Shockingly, when asked at deposition to articulate Plaintiffs' liability theory underpinning

17   his Scenario 2 model, Plaintiffs' expert could not do so.  *See* Anderson Decl., Ex. 18 (Mendes Dep.

18   Tr.) at 20:14-23:15 ("Q.  How do plaintiffs allege that employees with religious exemptions were

19   discriminated against, relative to those with medical or disability exemptions. . . . A. . . . It's not

20   something that is part of my scope.").  He had no idea that Plaintiffs' liability theory relies on the

21   County allegedly giving employees with medical and disability exemptions in high-risk roles

22   preferential treatment in seeking job transfers.  *See id.*  He could only say that Plaintiffs' theory had

23   something to do with "discrimination," but he could not say what.  *See id.*  He admitted time and

24   again that his Scenario 2 damages model failed to consider any evidence of preferential treatment.

25   *See id.* at 21:21-22:21 ("Q.  Is your scenario two damages model designed to determine damages due

26   to employees with medical or disability exemptions being given preferential treatment in job

27   transfers?  A.  The definition of discrimination, again, is not something that I'm providing an

28   opinion on."), 24:25-26:8, 30:16-31:4, 34:12-39:15, 41:5-45:17.  He admitted that he failed to

1 consider fundamental facts pertaining to alleged discrimination in job transfers, including whether a

2 proposed class member (a) refused to seek a job transfer; (b) was provided a job transfer or

3 modification; (c) was provided diligent job transfer assistance equal to medical/disability exemptees;

4 or (d) applied for jobs for which he or she was not qualified.  *See id.*; *see also id.* at 46:21-50:16.

5 His model also inexplicably uses the overall damages of Scenario 1 as a "starting point," and

6 subtracts a value based on the "typical experience of a medical/disability exemptee," which makes

7 no sense because the leave durations between the two populations are neither comparable nor related

8 to job transfers.  *See id.* at 13:14-19:6, 28:3-12; Volk Decl. ¶¶ 24-26.

9      In short, Plaintiffs' Scenario 2 damages model is a meaningless computation that has nothing

10 to do with preferential treatment in job transfers.  It therefore fails to satisfy Rule 23(b)(3).  *See*

11 *Comcast*, 569 U.S. at 35; *see also Doyle v. Chrysler Grp., LLC*, 663 F. App'x 576, 579 (9th Cir.

12 2016); *Siino v. Foresters Life Ins. & Annuity Co.*, 340 F.R.D. 157, 164 (N.D. Cal. 2022).  For the

13 same reasons, the model is so unreliable and unsupported by the facts of this case that the Court

14 should exclude it under Federal Rule of Evidence 702.  *See, e.g.*, *Svenson v. Google Inc.*, No. 13-

15 CV-04080-BLF, 2016 WL 8943301, at *7 (N.D. Cal. Dec. 21, 2016).

### V.    CONCLUSION

17      For the above reasons, the Court should deny Plaintiffs' motion for class certification.

19 Dated:  October 19, 2023                    Respectfully submitted,

20                                             TONY LOPRESTI
                                             COUNTY COUNSEL

22                                     By:   */s/ Bryan K. Anderson*
23                                             BRYAN K. ANDERSON
                                             Deputy County Counsel

24                                             Attorneys for Defendants
                                             COUNTY OF SANTA CLARA, SARA H.
25                                             CODY, JAMES WILLIAMS, and JEFFREY
                                             SMITH

28 2913260

Defendants' Opposition to Plaintiffs'                              22-CV-01019 BLF
Motion for Class Certification