Robert H. Tyler, CA Bar No. 179572
btyler@faith-freedom.com
Bethany Onishenko (*Pro Hac Vice*)
bonishenko@faith-freedom.com
ADVOCATES FOR FAITH & FREEDOM
25026 Las Brisas Road
Murrieta, California 92562
Telephone:     (951) 600-2733
Facsimile:     (951) 600-4996

Rachele R. Byrd (190634)
byrd@whafh.com
WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP
750 B Street, Suite 1820
San Diego, California 92101
Telephone:     (619) 239-4599
Facsimile:     (619) 234-4599

Attorneys for **Plaintiffs and the Class**

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| **UNIFYSCC**, an unincorporated California association on behalf of employees in Santa Clara County; **TOM DAVIS**, individually, and on behalf of all others similarly situated; **MARIA RAMIREZ**, individually, and on behalf of all others similarly situated; **ELIZABETH BALAYUT**, individually, and on behalf of all others similarly situated;<br><br>Plaintiffs,<br><br>vs.<br><br>**SARA H. CODY**, in her official capacity as the Santa Clara County Public Health Officer; **JAMES WILLIAMS**, in his official capacity as the County Counsel of Santa Clara County; **JEFFREY SMITH**, in his official capacity as the County Executive of Santa Clara County; and **SANTA CLARA COUNTY**;<br><br>Defendants. | Case No.:  22-cv-01019 BLF<br><br>**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**<br><br>DATE:     October 24, 2024<br>TIME:     9:00 a.m.<br>CTRM:     3, 5th Floor<br>JUDGE:    Hon. Beth Labson Freeman |

**PLEASE TAKE NOTICE** that on Thursday, October 24, 2024, at 9:00 a.m. in Courtroom 3, 5th Floor of the above-entitled Court, located at 280 South 1st Street, San Jose, CA 95113, Plaintiffs UnifySCC, Tom Davis, Maria Ramirez, and Elizabeth Baluyut ("Plaintiffs") will, and hereby do respectfully move this Court under Federal Rule of Civil Procedure 56 for a partial summary judgement.

Plaintiffs respectfully request the Court enter partial judgement in their favor because the undisputed evidence establishes that Defendants Santa Clara County, Dr. Sara Cody, James Williams, and Jeffrey Smith (collectively, "Defendants" or the "County") violated Title VII, California's Fair Employment and Housing Act. The County also violated the Free Exercise Clause of the Constitution of the United States and is therefore liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978).

This motion will be based on this notice of motion and motion for partial summary judgment, the memorandum of points and authorities appended hereto, the accompanying declarations, the [proposed] order in support thereof, and other evidence or arguments as may be presented. This motion does not include a separate or joint statement of undisputed facts, in accordance with Civil Local Rule 56.

Respectfully submitted,

DATED:  July 11, 2024                    **ADVOCATES FOR FAITH & FREEDOM**

_/s/ Bethany Onishenko_
Bethany Onishenko, Esq.

Robert H. Tyler, Esq.
Bethany Onishenko, Esq.
25026 Las Brisas Road
Murrieta, California 92562
Telephone:     (951) 600-2733

Rachele R. Byrd
**WOLF HALDENSTEIN ADLER**
 **FREEMAN & HERZ LLP**
750 B Street, Suite 1820
San Diego, CA  92101
Telephone:     (619) 239-4599
*Class Counsel*

# TABLE OF CONTENTS

I. INTRODUCTION ............................................................................................................. 1

II. STATEMENT OF FACTS ............................................................................................... 3

    A.    Santa Clara County's COVID-19 Vaccination Policies And Risk Tier System ............... 3

    B.    Differing Accommodation Processes For Medically And Religiously Exempt Employees In High-Risk Settings ...................................................................................... 6

    C.    Plaintiffs And Class Members .......................................................................................... 7

III. PROCEDURAL HISTORY ........................................................................................... 7

IV. LEGAL STANDARD ..................................................................................................... 9

V. ARGUMENT .................................................................................................................. 10

    A.    The County's COVID-19 Orders Violated Title VII And FEHA By Failing To Reasonably Accommodate Plaintiffs And The Class's Religious Beliefs ...................... 10

        1.    Plaintiffs and Class Members hold bona fide religious beliefs that conflict with the County's vaccination policies and orders, and they informed the County of these beliefs. ................................................................................ 11

        2.    The County took adverse action against Plaintiffs and the Class. ................... 13

        3.    The County did not reasonably accommodate Plaintiffs' and the Class's religious beliefs and cannot prove undue hardship........................................... 14

    B.    The County's Official Policies And Customs Are The Moving Force Behind The Violation Of Plaintiffs' And Class Members' Free Exercise Rights ............................... 17

    C.    The County's Vaccine Policies And Orders, Including The Risk Tier System And Accommodation Processes, Violated The Free Exercise Clause ..................................... 18

        1.    The County's Mandate, including the Risk Tier System, is not neutral and generally applicable because it burdens the Class's religious beliefs and creates a formal mechanism for determining risk level. ................................... 19

        2.    The County's accommodation processes are not neutral and generally applicable because they favor employees with medical exemptions over religious exemptions. ................................................................................... 20

        3.    The County's policies and accommodations processes cannot satisfy strict scrutiny........................................................................................................ 22

VI. CONCLUSION.............................................................................................................. 25

# TABLE OF AUTHORITES

Page(s)

## Cases

*Anderson v. Liberty Lobby, Inc.*,
  477 U.S. 242 (1986).................................................................................................9

*Ansonia Bd. of Educ. v. Philbrook*,
  479 U.S. 60 (1986)...............................................................................................14

*Bacon v. Woodward*,
  104 F.4th 744 (9th Cir. 2024)...............................................................................24

*Biden v. Missouri*,
  595 U.S. 87 (2022)................................................................................................15

*Bolden-Hardge v. Off. of California State Controller*,
  63 F.4th 1215 (9th Cir. 2023) ...............................................................10, 11, 12

*Bowen v. Roy*,
  476 U.S. 693 (1986)..............................................................................................22

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)................................................................................................9

*Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*,
  508 U.S. 520 (1990)...............................................................18, 19, 20, 22

*Crawford v. Trader Joe's Co.*,
  No. 5:21-cv-01519-JGB-SHK, 2023 WL 3559331 (C.D. Cal. May 4, 2023)..................10

*Dahl v. Bd. of Trustees of W. Michigan Univ.*,
  15 F.4th 728 (6th Cir. 2021) .................................................................................19

*Dawson v. Akal Sec. Inc.*,
  660 F. App'x 504 (9th Cir. 2016) ........................................................................13

*E.E.O.C. v. Abercrombie and Fitch Stores, Inc.*,
  575 U.S. 768 (2015).....................................................................10, 12, 14

*Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*,
  494 U.S. 872 (1990)..............................................................................................18

*FTC v. Stefanchik*,
  559 F.3d 924 (9th Cir. 2009) .................................................................................9

*Fulton v. City of Philadelphia*,
  141 S. Ct. 1868 (2021)..................................................................................19, 22

*Gage v. Mayo Clinic*,
  No. CV-22-02091-PHX-SMM, 2023 WL 8715519 (D. Ariz. Dec. 18, 2023) ..................12

*Groff v. DeJoy*,
  600 U.S. 447 (2023).....................................................................................11, 14

*Heller v. EBB Auto Co.*,
  8 F.3d 1433 (9th Cir. 1993) ...............................................................................12

*Kather v. Asante Health Sys.*,
  No. 1:22-cv-01842-MC, 2023 WL 4865533 (D. Or. July 28, 2023)...............................11

*Keene v. City and Cnty. of San Francisco,*
    No. 22-16567, 2023 WL 3451687 (9th Cir. May 15, 2023) .................................. 11

*Kennedy v. Bremerton Sch. Dist.,*
    597 U.S. 507, (2022) ..................................................................................... 24

*Lawson v. Washington,*
    296 F.3d 799 (9th Cir. 2002) ........................................................................ 14

*Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n,*
    138 S.Ct. 1719 (2018) .................................................................................. 18

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,*
    475 U.S. 574 (1986) ....................................................................................... 9

*Mois v. Wynn Las Vegas LLC,*
    715 F. App'x 600 (9th Cir. 2017) ................................................................. 13

*Monell v. Department of Social Services of the City of New York,*
    436 U.S. 658 (1978) ........................................................................... 2, 10, 17

*Moussazadeh v. Texas Dep't of Crim. Justice,*
    703 F.3d 781 (5th Cir. 2012) ........................................................................ 11

*Nidds v. Schindler Elevator Corp.,*
    113 F.3d 912 (9th Cir. 1996) ........................................................................ 10

*Oklahoma City v. Tuttle,*
    471 U.S. 808 (1985) ..................................................................................... 17

*Peterson v. Hewlett-Packard Co.,*
    358 F.3d 599 (9th Cir. 2004) ........................................................................ 11

*Rivera v. County of L.A.,*
    745 F.3d 384 (9th Cir. 2014) ........................................................................ 17

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
    592 U.S. 14 (2020) ................................................................................ 20, 22

*Sequeira v. Alameda Cnty.,*
    No. 3:06-cv-01413-MEJ, 2008 WL 5179108 (N.D. Cal. Dec. 10, 2008) .......................... 10

*Sherbert v. Verner,*
    374 U.S. 398 (1963) ..................................................................................... 19

*Steenmeyer v. Boeing Co.,*
    92 F.Supp.3d 1024 (W.D. Wash. 2015) ......................................................... 13

*Stormans, Inc. v. Wiesman,*
    794 F.3d 1064 (9th Cir. 2015) ................................................................. 19, 20

*Tandon v. Newsom,*
    141 S. Ct. 1294 (2021) ................................................................................. 20

*Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.,*
    450 U.S. 707 (1981) ................................................................................ 19, 22

*Toledo v. Nobel-Sysco, Inc.,*
    892 F.2d 1481 (10th Cir. 1989) .................................................................... 16

*Upshaw v. Alameda Cnty.,*
    377 F. Supp. 3d 1027 (N.D. Cal. 2019) ........................................................ 17

*Welsh v. United States,*
    398 U.S. 333 (1970) ..................................................................................... 11

*Zimmerman v. PeaceHealth*,
    No. 3:22-CV-05960, 2023 WL 7413650 (W.D. Wash. Nov. 9, 2023)...........................................13, 14

**Statutes**

42 U.S.C. § 198....................................................................................................................................9
42 U.S.C. § 1983.......................................................................................................................7, 8, 9, 17
42 U.S.C. § 2000e(j)...........................................................................................................................10
42 U.SC. § 2000e.................................................................................................................................9
Cal. Gov't Code § 12940....................................................................................................................8
Cal. Gov't Code § 12940(a)..............................................................................................................10
U.S. Const. amend. I.........................................................................................................................18

**Regulations**

29 C.F.R. § 1605.2(c).........................................................................................................................14
29 C.F.R. § 1605.2(c)(2)(ii)...............................................................................................................14

## MEMORANDUM OF POINTS AND AUTHORITIES

## I. INTRODUCTION

Plaintiffs and Class[1] members served Defendant Santa Clara County faithfully in various sectors of the County's operations throughout the height of the COVID-19 pandemic. Yet, in the fall of 2021, the County mandated that Plaintiffs and the Class, who held religious objections to the COVID-19 vaccination, receive the vaccination or face loss of their livelihoods. Defendants accomplished this through implementation of a risk tier system (the "Risk Tier System"), which, often arbitrarily, classified Plaintiffs and Class members as "high-risk" employees who could not be accommodated in their County positions. Concerningly, even roofers, HVAC technicians, and employees with no interaction with the public or with inmates or patients were labeled "high-risk."

Despite the availability of reasonable, alternative methods of protecting against infection with and transmission of COVID-19, the County put the Class to an ultimatum: get vaccinated in violation of your sincerely held religious beliefs or lose your source of livelihood. The County depleted a critical and willing workforce with an irrational vaccine mandate and Risk Tier System that held little regard for Plaintiffs' and Class members' rights of religious freedom and bodily autonomy.

Even after the County Health Officer, on March 7, 2022, amended its order to permit unvaccinated and exempt individuals across Santa Clara County to return to their (even high-risk) jobs with testing and masking requirements, the County did not permit its own unvaccinated, exempt personnel to return to their jobs. County officials have been unable to articulate any justification for treating the County's own personnel in this manner.

---

[1] On January 29, 2024, the Court certified the following class: "All individuals who: 1) work or worked for the County and/or [] were subject to its vaccine policies and orders, including the Risk Tier System; 2) were forced by the County to choose between taking the vaccine to maintain their jobs and/or their employment-related benefits or being placed on unpaid leave; 3) were [] classified as working in high risk jobs pursuant to the County's Risk Tier System; and 4) received [] a religious exemption from the County (the 'Class') between August 5, 2021 and September 27, 2022 (the 'Class Period')." ECF No. 125 at *25.

Thus, Plaintiffs and the Class ask this Court to grant their Partial Motion for Summary Judgment for the following reasons.

*First*, there is no genuine issue of material fact that the County's placement of Plaintiffs and the Class on involuntary and indefinite unpaid leave was not a reasonable accommodation under Title VII and California's Fair Employment and Housing Act ("FEHA"). Title VII and FEHA grant religious employees the right to maintain their employment without having to violate their religious beliefs. Yet, the County forced Plaintiffs and the Class to choose between their livelihoods or adherence to their religious beliefs, despite ample alternative means of accommodation.

*Second*, there is no genuine issue of material fact that the County is liable under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1978), for implementing unconstitutional policies, customs and practices restricting Plaintiffs' and Class members' rights to engage in the free exercise of their religious beliefs. The County issued express policies and orders requiring its workforce to receive the COVID-19 vaccine as a condition of employment. These policies are the driving force behind the Class's free exercise claim.

*Third,* there is no genuine issue of material fact that the County violated the Free Exercise Clause, as the County, without hesitation, relied on incomplete and favorably selective data to curtail the Classes' free exercise of. The County's Risk Tier System was not neutral and generally applicable because it burdened the Class's religious beliefs concerning vaccination and created a mechanism for individualized and arbitrary assessment concerning their risk tier classifications. The County's accommodation processes also were not neutral and generally applicable because the County treated medically exempt employees in high-risk settings more favorably than religiously exempt employees in high-risk settings (*i.e.*, the Class). The County's treatment of Plaintiffs and the Class cannot survive scrutiny, as taking away an employee's livelihood is not a measured response and more narrowly tailored alternatives were available, including masking, testing, remote work, and social distancing. Defendants cannot explain why these measures were adequate during the first 18 months of the pandemic, but not during the Class Period.

Accordingly, the Class asks this Court to grant partial summary judgment as to the Class's Title VII, FEHA, *Monell*, and Free Exercise claims.

## II. STATEMENT OF FACTS

**A.     Santa Clara County's COVID-19 Vaccination Policies And Risk Tier System**

On August 5, 2021, the State Health Department issued an order requiring all workers who provided services to or worked in health care facilities to be vaccinated by September 30, 2021 (the "State Order"). The State Order allowed for exemptions from the vaccine requirement for individuals with sincerely health religious beliefs or qualifying medical reasons. Ex. 4[2] at 52-53; Ex. 16  at 3; Ex. 15 at 21:19-23:20. Under the State Order, those individuals with exemptions were permitted to continue to work if they complied with certain testing and masking requirements. Ex. 4 at 53; Ex. 16 at 3.

On that same day, County Executive Jeffrey V. Smith and County Counsel James R. Williams issued a Memorandum re COVID-19 Vaccination Requirement for County Personnel. This mandate required all County personnel to be vaccinated against COVID-19, but allowed for exemptions for individuals with medical contraindications, disability, and sincerely held religious belief, practice, or observance. Ex. 5; Ex. 15 at 23:24-24:11, 27:25-28:11; Ex. 17 at 85-88. In the weeks following issuance of the vaccine mandate, Defendants created a Risk Tier System that classified employees as working in low-risk, intermediate-risk, or high-risk positions. Ex. 10. County employees would apply for and receive vaccination exemptions, and then County department heads would determine whether the employee's role was high, intermediate, or low risk. Ex. 11 at 142:10-13; Ex. 21 at 17:5-17:15; Ex. 28 at 1; Ex. 27 at 54:21-56:14; Ex. 18 at 2. Employees in low-risk and intermediate-risk positions with religious exemptions could continue to work if they wore a mask and complied with certain COVID-19 testing requirements. Ex. 10 at 1 ("[E]mployees who work in office settings and have minimal contact with the public are generally determined to be in lower-risk roles. Employees whose work involves significant contact with the public, but generally does not require significant close contact or work with particularly vulnerable populations are generally determined to be in intermediate-risk roles."). However, employees categorized as working in high-risk positions could not continue to work if they remained unvaccinated, even with a religious exemption. Ex. 18 at 2; Ex. 48; Ex. 10 at 1

---

[2] All citations, unless otherwise specified, are to the Declaration of Bethany Onishenko in Support of Plaintiffs' Motion for Partial Summary Judgment, filed herewith.

("Employees who work in health care settings where they have contact with patients, employees who work with young children, and employees who work in other particularly high-risk sites (shelters, custodial facilities, etc.) are in high-risk roles.")

The County tasked each department head with determining the risk level of County positions. Ex. 3 at 45:8-23; Ex. 15 at 48:23-50:19; 99:22-100:22. In larger departments, department heads often passed the assignment off to people who worked under them. Ex. 15 at 50:4-14. The determinations were made on a case-by-case basis and did not require consulting with a medical professional. Ex. 15 at 50:14-19; Ex. 14 at 2 ("Each department determines the risk level for all positions within their department, based on guidance from Public Health and input from the County Executive's Office."); Ex. 3 at 28:11-29:23, 51:5-52:2 (in practice, the managers did not seek guidance from County Health). For example, department heads categorized nurses and correctional officers high-risk, yet also labeled roofers, HVAC mechanics, and other personnel with limited public interaction or contact with inmates or patients as high-risk. Ex. 43, ¶ 3; Ex. 44, ¶ 3; Ex. 45, ¶ 4; Ex. 47, ¶ 4; Exs. 52-54; Declaration of Tom Davis in Support of Motion for Partial Summary Judgment ("Davis Decl."), ¶ 4.

On December 22, 2021, the State Health Department amended its prior order to make booster vaccines mandatory. Ex. 4 at 47-48; Ex. 20. The December 22, 2021, State order again allowed for exemptions from the vaccine and booster requirements and permitted exempt individuals to work in health care facilities by meeting certain masking and testing requirements. Ex. 20 at 4-5.

On December 28, 2021, the County Health Officer issued a health order "requiring up-to-date vaccination for workers in certain high-risk settings" in the County "(i.e., both fully vaccinated and boosted against COVID-19 if eligible for a booster)" by January 24, 2022. Ex. 4 at 67-73. The higher risk settings included skilled nursing facilities, healthcare delivery facilities, medical first responders, jails and other correctional facilities. *Id*. at 69. The December 28 order also expanded the number of settings and positions considered high-risk. *Id.* (labeling high-risk "personnel who are not permanently stationed at or regularly assigned to a High-Risk Setting but who in the course of their duties may enter or work in High-Risk Setting even on an intermittent or occasional basis…").

On January 10, 2022, the County issued a directive establishing a limited waiver process. Ex. 8. "The waiver is available to entities facing critical staffing shortages and applies to personnel who

receive a bona fide medical and/or religious exemption and who follow specific safety protocols." *Id.* at 2. However, the waiver was subject to revocation. *Id.* at 3.

On March 7, 2022, the County Public Health Department issued a County-wide public health order permitting unvaccinated, exempt employees to return to work in higher-risk settings so long as they masked and tested. Ex. 17, ¶ 52; Ex. 4 at 75. Despite this order, the County did not permit its unvaccinated, exempt employees to return to work. Ex. 15 at 95:2-96:2; 97:9-99:17; Ex. 17 at 113. Instead, on March 28, 2022, the County announced that it had made "updates" to its vaccination policy, which still required "all County personnel [to] be fully vaccinated and up-to-date on boosters for which they are eligible," and which still provided that unvaccinated workers, even if exempt, could not return to work. Ex. 17 at 113-14; Declaration of Elizabeth Baluyut in Support of Motion for Partial Summary Judgment ("Baluyut Decl.") at ¶ 2. Finally, on September 27, 2022, the County Health Department issued an updated policy, rescinding the vaccination requirement for all County employees and risk tiers. Ex. 9; Ex. 3 at 84:8-19, 88:4-17.

The County's vaccination policies and orders, including the Risk Tier System, were arbitrary and irrational and were not narrowly tailored. The primary benefit of COVID-19 vaccination accrued to the individual receiving the vaccination, not the public. Ex. 36 at 1; Ex. 33 at 8:4-14, 89:11-17; Ex. 34, ¶ 28. [3] In fact, the COVID-19 vaccine trials did not even test for transmission prevention. Ex. 33 at 60:10-21; Ex. 34, ¶ 9; Ex. 35 at 51.

Moreover, Defendants did not enforce their vaccine orders and policies equally and consistently. For instance, the County allowed some unvaccinated and/or non-boosted employees in high-risk settings to work (including within six feet of others, such as correctional deputies. Ex. 45, ¶¶ 5-6; Ex.

---

[3] Even though Dr. Rudman testified that "one of the primary benefits" of COVID vaccination is to the recipient of the vaccine, her handwritten notes indicate her agreement with Dr. Duriseti that it is "the" primary benefit, and the definition of "primary" excludes the possibility of more than one. *See* Merriam-Webster Dictionary at https://www.merriam-webster.com/dictionary/primary?src=search-dict-hed (defining "primary" as "of first rank, importance, or value").

1   46, ¶ 7; Ex. 55, ¶ 4. The correctional deputies worked in a COVID-19 unit where they were exposed to

2   around seventy inmates infected with COVID-19. Ex. 55, ¶ 4.

3   **B.      Differing Accommodation Processes For Medically And Religiously Exempt Employees In**

4   **High-Risk Settings**

5       The County's vaccination policy reflects that medically exempt employees were "entitled to

6   priority consideration for placement in or selection for vacant positions as part of the accommodation

7   process, consistent with disability law." Ex. 15 at 54:20-55:7; Ex. 18. In practice, this resulted in the

8   County referring religiously exempt and medically exempt employees in high-risk settings to different

9   departments that offered different accommodation processes. Ex. 21 at 37:9-38:2, 41:9-20; Ex. 23; Ex.

10   27 at 25:12-20; Ex. 32; Ex. 10.

11      Employees with medical exemptions were referred to work with the County's Equal

12   Opportunity Division ("EOD"), which would then assist medically exempt employees in identifying

13   positions that would accommodate the employee's medical disability. Ex. 21 at 41:1-20; Ex. 23; Ex. 27

14   at 25:12-20. Once a vacancy was identified, the EOD would work with the Department to directly place

15   the medically exempt employee into the identified position. Ex. 21 at 42:16-19, 47:22-48:10, 59:12-

16   60:20; Ex. 25 at 1. The medically exempt employee did not have to apply or compete for the position.

17   Ex. 21 at 59:12-60:20. Additionally, the EOD signed off on various accommodations for unvaccinated

18   medically exempt employees, including telework. Ex. 24 at 2; Ex. 21 at 55:9-57:25.

19      In contrast, employees with religious exemptions were referred to work with the County's

20   Employment Services Agency ("ESA"), who created a VaxJobReview Team. Ex. 27 at 25:12-20; Ex.

21   32 at 3 (Chavarria is "only dealing with [exempt employees] that have religious exemptions, Guy

22   Nuzum is dealing with [exempt employees] with medical exemptions. Vaxjobreview@esa.sccgov.org

23   is where they can send an application for review…"); Ex. 13 at 18:11-15; Ex. 14; Ex. 21 at 42:16-19;

24   Ex. 23 at 1; Ex. 48 at 1-2. This team assisted religiously exempt employees in identifying open County

25   positions. Ex. 27 at 36:14-38:14; Ex. 32 at 3; Ex. 14; Exs. 30-31; Ex. 48 at 1-2. The employee was

26   required to apply for the position themselves and engage in a competitive recruitment process to obtain

27   the position. Exs. 30-32 (outlining vaxjobreview process); Ex. 32 at 3 ("This still does not guarantee

28   [religiously exempt employees] a job, they still have to be in the top 10 and be chose."). Religiously

exempt employees did not know the risk tier of the position they were applying for until they applied for the new position. Ex. 28 at 1 ("Currently there is no list for "high, low, or intermediate risk" positions, when you apply for a position and you are accepted at that time we will find out if it is high, low or intermediate risk."); Davis Decl., ¶ 8; Baluyut Decl., ¶ 7. Religiously exempt employees were not granted automatic placement/transfer, preferential treatment, or any alternative form of accommodation. Ex. 29 at 1 ("The County cannot place people into positions based on their religious beliefs or give them preferential treatment based on religion or religious beliefs, even though the County may be able to provide preferential treatment in some circumstances based on disability."); Ex. 27 at 51:22-54:18; Ex. 13 at 27:11-20, 31:18-22; Ex. 18 at 3, ¶ 4. After the Court issued a preliminary injunction enjoining this practice (*see infra*.), the County responded by no longer providing transfers or reassignments to any employees with exemptions—religious or medical. Instead, all unvaccinated employees with exemptions were required to apply for a new position. Ex. 19.

## C.    Plaintiffs And Class Members

Plaintiffs and class members work or worked for the County and were subject to its COVID-19 vaccine policies and orders. Ex. 51. Each hold sincere religious beliefs that prevent them from taking the COVID-19 vaccine. *Id.* The County approved the three Plaintiffs' and the other 461 Class members' sincerely held religious beliefs by granting them religious exemptions, but the County "accommodated" them by relegating them to unpaid leave. Ex. 51; Ex. 18; Ex. 56 at 17:9-12; 17:24-18:16; Ex. 11 at 131:10-15, 134:19; Ex. 58 at 15; Ex. 10; Ex. 57 (Class's leave data); Ex. 58 at 13; Ex. 48 at 1. The County did not offer reasonable accommodations to Plaintiffs and Class members such as weekly testing, teleworking, working a modified shift, or requiring them to wear N95 masks. Davis Decl., ¶ 6; Baluyut Decl., ¶ 5; Declaration of Maria Ramirez ("Ramirez Decl."), ¶ 5; Ex. 10. Nor did the County engage in any form of interactive process with Plaintiffs or Class members to identify any alternative accommodations. Davis Decl., ¶ 7; Baluyut Decl., ¶ 6; Ramirez Decl., ¶ 6; Ex. 10.

## III. PROCEDURAL HISTORY

Plaintiffs UnifySCC, Tom Davis and Maria Ramirez filed this action on February 18, 2022, alleging claims against Defendants Sara H. Cody, James Williams, Jeffrey Smith and Santa Clara County for: (1) Violation of the Free Exercise Clause of the First Amendment to the United States

Constitution (42 U.S.C. § 1983) (the "Free Exercise Clause"); (2) Violation of California's Fair Employment and Housing Act (Cal. Gov't Code § 12940) ("FEHA"); (3) Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983); and (4) Deprivation of Civil Rights Under 42 U.S.C. § 1983 (*Monell*).

On March 3, 2022, Plaintiffs filed a Motion for Temporary Restraining Order and Order to Show Cause ("TRO Motion"), which the Court denied on March 8, 2022, due to Plaintiffs delay in seeking relief. ECF No. 21; ECF No. 25. Then, on April 1, 2022, Plaintiffs filed a Motion for Preliminary Injunction (ECF No. 27), which the Court granted in part on June 30, 2022 (Order Granting in Part and Denying in Part Motion for Preliminary Injunction, ECF No. 44 (the "Order")). The County admitted that "in assisting exempt employees in high-risk roles with transfers to available County positions in other risk tiers, the County gives 'those with disability or medical contraindication vaccine exemptions . . . 'preferential consideration' pursuant to California State Disability Regulations and the Americans with Disabilities Act.'" Order at 16 (quoting ECF No. 31-3 (Marquez Decl.), ¶ 41; *see also* Ex. 17, ¶ 41). The Court found that "this portion of the Accommodations framework likely 'operate[s] in practice' in way that 'target[s] religious practices' by placing those with religious exemptions at a disadvantage behind those with secular exemptions (medical and disability)." *Id*. at 16-17 (citations omitted). The Court therefore held that Plaintiffs "have shown that they are likely to succeed in proving that this portion of the Accommodations framework is not operationally neutral." *Id*. at 17. "Even if federal or California disability law requires priority consideration of disabled applicants for open government positions, the County cannot grant that class of individuals priority consideration over those with religious exemptions in violation of the First Amendment." *Id*. The Court enjoined "Defendants and their agents, employees, and successors in office" "from giving to employees whose current positions are in high-risk tiers any priority consideration for vacant County positions based on the type of exemption from the County's vaccine mandate that the employee received." *Id*. at 23.

Plaintiffs filed a Verified First Amended Class Action Complaint for Declaratory and Injunctive Relief and Damages (the "FAC") on August 23, 2022. ECF No. 55. The FAC added class allegations and asserts claims for: (1) Violation of the Free Exercise Clause of the First Amendment to the United States Constitution (42 U.S.C. § 1983) (FAC, ¶¶ 63-71); (2) Violation of FEHA (*id*, ¶¶ 72-78);

(3) Violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution (42 U.S.C. § 1983) (*id.*, ¶¶ 79-85); (4) Violation of the Establishment Clause of the First Amendment to the United States Constitution (42 U.S.C. § 1983) (*id.*, ¶¶ 86-89); (5) Violation of Title VII of the Civil Rights Act of 1964 (42 U.SC. § 2000e, *et seq.*) (*id.*, ¶¶ 90-93); and (vi) Deprivation of Civil Rights Under 42 U.S.C. § 1983 (*Monell*) (FAC, ¶¶ 94-97).

Plaintiffs filed a Motion for Class Certification on July 14, 2023. ECF No. 81. The Court granted the motion in part and denied in part. ECF No. 125. Specifically, the Court granted class certification as to Defendants' liability under the Free Exercise Clause, Equal Protection Clause, Establishment Clause, FEHA, and Title VII but did not grant class certification as to damages. *Id.* at 21-25.

### IV. LEGAL STANDARD

Summary judgment is appropriate when the pleadings, the discovery, and the affidavits provided establish that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A material fact is one which may affect the outcome of the case. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is genuine if the evidence is such that a reasonable trier of fact could return a verdict in favor of the nonmoving party. *Id.*

A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). If the movant has sustained its burden, the nonmoving party must "show a genuine issue of material fact by presenting affirmative evidence from which a jury could find in [its] favor." *FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009). The nonmoving party must go beyond the allegations set forth in its pleadings. *See* Fed. R. Civ. P. 56(c). "[B]ald assertions or a mere scintilla of evidence" will not suffice. *Stefanchik*, 559 F.3d at 929. Indeed, the mere presence of "some metaphysical doubt as to the material facts" is insufficient to withstand a motion for summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* at 587 (citation omitted).

## V. ARGUMENT

Plaintiffs are entitled to partial summary judgment because there is no genuine issue of material fact that the County's irrational application of its vaccine orders and policies, including the Risk Tier System, violated Title VII, FEHA. Additionally, the County is liable for its conduct pursuant to *Monell*, 436 U.S. 658, because its vaccine orders and policies violated the Free Exercise Clause of the First Amendment.

### A.   The County's COVID-19 Orders Violated Title VII And FEHA By Failing To Reasonably Accommodate Plaintiffs And The Class's Religious Beliefs

The County failed to accommodate Plaintiffs' and Class members' religious beliefs prohibiting COVID-19 vaccination and instead relegated them to indefinite and involuntary unpaid leave. Both Title VII and FEHA forbid an employer from taking adverse action against an employee because of a conflict between the person's religious beliefs and an employment requirement. 42 U.S.C. § 2000e(j); Cal. Gov't Code § 12940(a). "Both statutes require employers to accommodate [employees'] religious beliefs unless doing so would impose an undue hardship." *Bolden-Hardge v. Off. of California State Controller*, 63 F.4th 1215, 1222 (9th Cir. 2023).

The elements of a failure to accommodate claim under FEHA and Title VII are identical. *See Crawford v. Trader Joe's Co.*, No. 5:21-cv-01519-JGB-SHK, 2023 WL 3559331, at *8 (C.D. Cal. May 4, 2023). "Courts look to federal interpretations of discrimination law when interpreting the provisions of FEHA, and therefore the federal and state discrimination claims should be analyzed together." *Sequeira v. Alameda Cnty.*, No. 3:06-cv-01413-MEJ, 2008 WL 5179108, at *4 (N.D. Cal. Dec. 10, 2008) (citing *Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 916 (9th Cir. 1996)). As stated by the United States Supreme Court, "Title VII [and thus FEHA] does not demand mere neutrality regarding religious practices – that they be treated no worse than other practices. Rather, it gives them favored treatment . . .. Title VII requires otherwise-neutral policies to give way to the need for accommodation." *E.E.O.C. v. Abercrombie and Fitch Stores, Inc.*, 575 U.S. 768, 774 (2015).

Courts employ a two-part burden-shifting framework to analyze Title VII and FEHA failure to accommodate claims. First, a plaintiff must show that "(1) he had a bona fide religious belief, the practice of which conflicts with an employment duty; (2) he informed his employer of the belief and

conflict; and (3) the employer discharged, threatened, or otherwise subjected him to an adverse employment action because of his inability to fulfill the job requirement." *Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 606 (9th Cir. 2004). Once a plaintiff has established a prima facie case, the employer must then "establish that it initiated good faith efforts to accommodate the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Id.* (citation omitted). Undue hardship means "substantial increased costs in relation to the conduct of its particular business." *Groff v. DeJoy*, 600 U.S. 447, 470 (2023).

### 1. Plaintiffs and Class Members hold bona fide religious beliefs that conflict with the County's vaccination policies and orders, and they informed the County of these beliefs.

The first two elements of Title VII and FEHA claims require that an employee holds a religious belief that conflicts with an employment duty and the employee gives their employer notice of the belief and conflict. A bona fide religious belief is one that is sincerely held. *Welsh v. United States*, 398 U.S. 333, 339 (1970) ("The task is to decide whether the beliefs professed by a registrant are sincerely held and whether they are, in his own scheme of things, religious.") (internal citations omitted); *see also Keene v. City and Cnty. of San Francisco*, No. 22-16567, 2023 WL 3451687, at *1 (9th Cir. May 15, 2023) (citing U.S. Equal Emp. Opportunity Comm'n, EEOC-CVG-2021-3, Section 12: Religious Discrimination, § 12-I(A)(2)).

In its published guidance, the Equal Employment Opportunity Commission ("EEOC") states that "the sincerity of an employee's stated religious belief is usually not in dispute and is 'generally presumed or easily established.'" EEOC Guidance § 12-I(A)(2) (quoting *Moussazadeh v. Texas Dep't of Crim. Justice*, 703 F.3d 781, 790 (5th Cir. 2012)). Put in stronger terms, "[a] court should generally accept the assertion of a sincerely held religious belief." *Kather v. Asante Health Sys.*, No. 1:22-cv-01842-MC, 2023 WL 4865533, at *3 (D. Or. July 28, 2023).

When evaluating whether an employment requirement genuinely conflicts with religious belief, the Ninth Circuit has stated that "the burden to allege a conflict with religious beliefs is fairly minimal." *Bolden-Hardge*, 63 F.4th at 1223. Crucially, this inquiry is not an inquiry into the reasonableness of a

plaintiff's beliefs. *Id*. When an individual asserts that a requirement burdens their religious beliefs, a court's narrow function is only to evaluate whether a plaintiff "has alleged an actual conflict." *Id*.

Notice to the employer "require[s] only enough information about an employee's religious needs to permit the employer to understand the existence of a conflict." *Heller v. EBB Auto Co.*, 8 F.3d 1433, 1439 (9th Cir. 1993). Completion of a religious exemption form is generally sufficient to put an employer on notice of an employee's religious beliefs and conflict with an employment duty. *See Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 774; *Gage v. Mayo Clinic*, No. CV-22-02091-PHX-SMM, 2023 WL 8715519, at *4 (D. Ariz. Dec. 18, 2023).

Here, the County's vaccination policies and orders required Plaintiffs and Class members to receive the COVID-19 vaccine and subsequent boosters as a condition of continued paid employment. Ex. 5; Ex. 15 at 23:24-24:11, 27:25-28:11; Ex. 17 at 85-88; Ex. 17 at 113-114; Ex. 10. Plaintiffs and Class members each hold religious beliefs that conflict with this requirement. They believe, for example, that the body is a temple, COVID-19 vaccines are derived from aborted fetal tissue, God is a healer, the vaccine is the mark of the beast, among other beliefs. *See* Ex. 58 at 15; Ex. 21 at 70:8-22; Davis Decl., ¶ 3; Baluyut Decl., ¶ 3; Ramirez Decl., ¶ 3.

Plaintiffs' and Class members' religious beliefs regarding the COVID-19 vaccination are outlined in the religious exemption request forms they submitted to the County, which were subsequently approved by the County. Ex. 12; Ex. 58 at 15; Ex. 21 at 17:16-19:3, 23:4-10; Ex. 11 at 131:10-5. The County required each Plaintiff and Class member to complete the form to receive an exemption to the vaccination policy. Ex. 12; Ex. 21 at 17:16-22, 23:4-10. The form specifically asked each employee to "identify your sincerely held religious belief, practice, or observance that is the basis for your request for an exception as a religious accommodation" and explain how that "religious belief, practice, or observance conflicts with the County's COVID-19 vaccination requirement." Ex. 12. The Plaintiffs' and Class members' completed religious exemption request forms are sufficient under Title VII and FEHA to put the County on notice of each employee's religious beliefs and their conflict with County policy. *See Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 774; *Gage*, 2023 WL 8715519, at *4. Accordingly, the evidence reflects that the first two elements of Title VII and FEHA violations are satisfied.

1        **2.      *The County took adverse action against Plaintiffs and the Class.***

2            The County's vaccination policies included a Risk Tier System that relegated Plaintiffs and

3    Class members to involuntary and indefinite unpaid administrative leave upon grant of a religious

4    exemption. Ex. 48; Ex. 18 at 2, ¶ 1; Ex. 10 at 1; Ex. 11 at 129:17-24; Ex. 15 at 67:6-68:2; Ex. 48 at 1.

5    Indefinite and involuntary unpaid leave is an adverse action under Title VII. *Dawson v. Akal Sec. Inc.*,

6    660 F. App'x 504, 506 (9th Cir. 2016) (unpublished) (involuntary unpaid leave may be an adverse

7    employment action); *Mois v. Wynn Las Vegas LLC*, 715 F. App'x 600, 601 (9th Cir. 2017)

8    (unpublished) (unpaid leave was not a reasonable accommodation under ADA where light duty work

9    was an option); *Zimmerman v. PeaceHealth*, No. 3:22-CV-05960, 2023 WL 7413650, at *5 (W.D.

10   Wash. Nov. 9, 2023) (indefinite unpaid leave was an adverse employment action and not a reasonable

11   accommodation); *cf. Steenmeyer v. Boeing Co.*, 92 F.Supp.3d 1024, 1031 (W.D. Wash. 2015) (unpaid

12   leave may be a reasonable accommodation *when it is requested*).

13           Here, involuntary unpaid administrative leave was the only accommodation offered to Plaintiffs

14   and Class members. The County did not provide any alternative form of accommodation. The County

15   placed Plaintiffs and Class members on leave indefinitely, and many Class members were on leave for

16   upwards of nine months. Ex. 18 at 2, ¶ 1; Ex. 10; Ex. 57 (Class's leave data); Ex. 48. The County

17   granted approximately 460 religious exemptions for employees working in what it categorized as high-

18   risk settings. Ex. 51; Ex. 56 at 17:9-12; 17:24-18:16; Ex. 11 at 131:10-15, 134:19. Apart from a handful

19   of Sheriff's department employees who were permitted to return to work for a short period of time,

20   high-risk employees with religious exemptions were not allowed to return to work, not even remotely.

21   Ex. 45, ¶ 5; Ex. 46, ¶ 7. Rather, all Plaintiffs and Class members were placed on unpaid administrative

22   leave unless they violated their sincerely held religious beliefs by becoming vaccinated. Davis Decl., ¶

23   5; Baluyut Decl., ¶ 4; Ramirez Decl., ¶ 4; Ex. 45, ¶ 6; Ex. 48 at 1. Thus, the evidence establishes the

24   third element of prima facie Title VII and FEHA claims – the County took adverse action against

25   Plaintiffs and the Class.

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR PARTIAL SUMMARY JUDGMENT
Case No.:  22-cv-01019 BLF

      **3.**    *The County did not reasonably accommodate Plaintiffs' and the Class's religious beliefs and cannot prove undue hardship.*

Because Plaintiffs have shown a prima facie case of failure to accommodate under Title VII and FEHA, the burden shifts to the County to show that it "initiated good faith efforts to accommodate reasonably the employee's religious practices or that it could not reasonably accommodate the employee without undue hardship." *Lawson v. Washington*, 296 F.3d 799, 804 (9th Cir. 2002). Pursuant to guidance promulgated by the EEOC, "A refusal to accommodate is justified only when an employer ... can demonstrate that an undue hardship would in fact result from each available alternative method of accommodation." 29 C.F.R. § 1605.2(c). To establish that a particular accommodation would impose undue hardship, "an employer must show that the burden of granting an accommodation would result in substantial increased costs in relation to the conduct of its particular business." *Groff*, 600 U.S. at 470. Where an employer determines a particular accommodation request would cause undue hardship, the employer must consider alternative accommodation options. *Id.* at 473. Additionally, the EEOC instructs that the County was required to "offer the alternative which least disadvantages the individual with respect to his or her employment opportunities." 29 C.F.R. § 1605.2(c)(2)(ii).

The Supreme Court has indicated:

> [T]he… accommodation of … religious needs by merely allowing unpaid leave does not eliminate the conflict. Rather, the offer forces [the employee] to choose between following his religious precepts with a partial forfeiture of salary and violating these precepts for work with full pay. It is precisely this loss of compensation that entitles [the employee] to further accommodation.

*Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 74 (1986) (Marshall, J., concurring). Moreover, in *Zimmerman*, the court noted that indefinite unpaid leave does not clearly resolve the employment-religion conflict, suggesting that it should not be considered a narrowly tailored solution. 2023 WL 7413650 at *5.

The County's vaccine policies and orders failed to "give way to the [Class's] need for accommodation." *Abercrombie and Fitch Stores, Inc.*, 575 U.S. at 774. The County's purported accommodation of involuntary and indefinite unpaid leave was patently unreasonable, given that Plaintiffs and Class members were not subject to the vaccine orders and policies because the County

granted them religious exemptions. *Cf.* Ex. 37 at 20:18-29:17; Exs. 39-42. Nevertheless, the County unilaterally determined that the only accommodation it could provide Plaintiffs and the Class was unpaid leave. Ex. 10; Ex. 18 at 2, ¶ 1; Ex. 58 at 13; Ex. 48 at 1. Taking away a religious objector's livelihood for an indefinite period for refusing to consent to a vaccine that violates the objector's religious beliefs is not a reasonable accommodation. Ex. 37 at 29:19-31:18; Ex. 38 at 15. Had the County engaged in good-faith efforts to accommodate the Class's religious beliefs, it would have discovered ample alternative means of accommodation beyond indefinite unpaid leave.

Considering the County's high vaccination rates, there is no justification for the County excluding Plaintiffs and Class members from the workplace. Ex. 59 (reflecting that when the vaccination mandate was implemented, 81.7% of County residents were vaccinated); Ex 49 (identifying that as of March 1, 2022, 90.5% of individuals ages 5 and up in the County were vaccinated, while only 4.1% remained unvaccinated). The Class was but 2 percent of the County's overall workforce. Ex. 15 at 16:20-21 (the County had 23,000 employees); ECF No. 137, Ex. 1, ¶ 3 (461 Class members). Defendants' practice ignores that both state and federal mandates, which were based on the same scientific consensus, expressly allowed for religious accommodations, even in high-risk settings. Ex. 3 at 61:3-21; Ex. 4 at 53; Ex. 16 at 3. The Supreme Court cited the allowance of religious exemption in upholding a similar vaccination regulation. *See Biden v. Missouri*, 595 U.S. 87, 89 (2022) ("[P]articipating facilities must ensure that their staff—unless exempt for medical or religious reasons— are vaccinated against COVID-19."); *id.* at 91 ("The rule requires providers to offer medical and religious exemptions ....").

The County's own experts admit that masking and social distancing help limit the spread of COVID-19, and these types of accommodations incur de minimis cost to the County. Ex. 3 at 117:24-118:21; Ex. 38 at 1 (pdf 5), 9 (pdf 13); Ex. 37 at 14:6-19. Notably, prior to the vaccine mandate and throughout the height of the COVID-19 pandemic, the County permitted all employees to mask and test. Ex. 11 at 29:22-30:9; Davis Decl., ¶ 6; Baluyut Decl., ¶ 5; Ramirez Decl., ¶ 5. At all relevant times following the vaccination mandate, the County permitted religiously exempt employees in low- and intermediate-risk settings to wear masks and test for COVID-19 but precluded Plaintiffs and Class members from the same opportunity. Ex. 10. The County was aware that its orders concerning exempt

employees in high-risk settings were stricter than State guidance and other counties' practices, both of which permitted exempt employees to continue working in high-risk settings if the employees remained in compliance with masking and testing requirements. Ex. 3 at 23:24-24:11, 28:11-29:23, 61:3-21, 122:7-123:21; Ex. 15 at 98:25-99:17.

The County's failure to accommodate is particularly unreasonable from the period of March 7, 2022, to September 27, 2022, which marks the second half of the Class Period. On March 7, 2022, the County Public Health Department amended its order to permit unvaccinated employees working in the County of Santa Clara with exemptions from the vaccination requirements to return to work, even if they worked in higher-risk settings, so long as they complied with certain masking and testing requirements. Ex. 17, ¶ 52; Ex. 4 at 75. Despite this order, the County did not change its policy to permit unvaccinated, exempt employees to return to work. Ex. 3 at 78:21-84:1; Ex. 15 at 95:2-96:2; 97:9-99:17; Ex. 17 at 113. County officials are unable to articulate any rationale, including any scientific basis, for why they did not permit their unvaccinated, exempt personnel to return to the workplace until September 27, 2022, nearly 6 months after the County's own Department order permitted their return. Ex. 9; Ex. 3 at 84:8-19, 88:4-17. Therefore, at a minimum, Plaintiffs are entitled to partial summary judgment as to this latter half of the Class Period.

Finally, the County failed to engage in the interactive process with any Class member. Davis Decl., ¶ 7; Baluyut Decl., ¶ 6; Ramirez Decl., ¶ 6; Ex. 10. Following a determination that the exempt employee's role was high-risk, the employee was immediately placed on leave. Ex. 10; Ex. 18 at 2, ¶ 1. The County did not entertain any other form of accommodation. Ex. 10; Davis Decl., ¶ 7; Exs. 52-54. At no time were Plaintiffs or Class members informed that accommodating their requests would be an undue hardship for the County. *See Toledo v. Nobel-Sysco, Inc*., 892 F.2d 1481, 1488 (10th Cir. 1989) ("The employer is on stronger ground when he has attempted various methods of accommodation and can point to hardships that actually resulted."). Accordingly, summary judgment is appropriate on Plaintiffs' Title VII and FEHA claims.

**B.**      **The County's Official Policies And Customs Are The Moving Force Behind The Violation Of Plaintiffs' And Class Members' Free Exercise Rights**

To establish a county's liability pursuant to 42 U.S.C. § 1983, "[a] plaintiff[] must show that the challenged conditions were part of a policy, custom or practice officially adopted by defendants." *Upshaw v. Alameda Cnty.*, 377 F. Supp. 3d 1027, 1032 (N.D. Cal. 2019) (citing *Monell*, 436 U.S. at 690). A plaintiff must allege that "the policy or custom 'evince[s] a "deliberate indifference" to the constitutional right and [is] the "moving force behind the constitutional violation."'" *Id.* (*quoting Rivera v. County of L.A.*, 745 F.3d 384, 389 (9th Cir. 2014)). Once a municipal policy is established, "it requires only one application ... to satisfy fully *Monell's* requirement that a municipal corporation be held liable only for constitutional violations resulting from the municipality's official policy." *Oklahoma City v. Tuttle*, 471 U.S. 808, 822 (1985).

Here, Plaintiffs and Class members have alleged a Free Exercise Clause violation inflicted by the County's vaccine policies, customs and/or practices, including the Risk Tier System and accommodations processes. It is undisputed that the County expressly adopted various vaccination policies that required all County employees to receive the COVID-19 vaccine and subsequent booster shots. Ex. 5 ; Ex. 15 at 23:24-24:11, 27:25-28:11; Ex. 17 at 85-88; Ex. 17 at 113-114; Ex. 10. As a part of these policies, the County created a Risk Tier System that classified employees as working in low-risk, intermediate-risk, or high-risk positions. Ex. 10. Employees categorized as working in high-risk positions could not continue to work if they remained unvaccinated, even if they received a religious exemption. *Id.*; Davis Decl., ¶ 5, Baluyut Decl., ¶ 4; Ramirez Decl., ¶ 4.

Additionally, the County initiated differing and more favorable accommodations processes for medically/disability exempt employees than religiously exempt employees. Employees with medical/disability exemptions were referred to work with the EOD, who would assist medically exempt employees by attempting to directly place them into a new position. Ex. 21 at 41:1-20, 42:16-19, 47:22-48:10, 59:12-60:20; Ex. 23; Ex. 27 at 25:12-20; Ex. 25 at 1. In contrast, employees with religious exemptions were referred to work with the ESA's VaxJobReview Team, who would help identify positions for religiously exempt employees to engage in the competitive recruitment process for. Ex.

27 at 25:12-20, 36:14-38:14; Ex. 32 at 3; Ex. 13 at 18:11-15; Ex. 14; Ex. 21 at 42:16-19; Ex. 23 at 1; Exs. 30-32; Ex. 48 at 1-2.

These official policies and practices are the "moving force" behind Plaintiffs' and Class Members' Free Exercise claim, as the policies forced Class members to choose between adhering to their religious beliefs or face losing their livelihood. *See infra.* Additionally, the County's accommodations processes constituted an official policy, custom or practice, resulting in Class members being treated less favorably than medically exempt employees in violation of the Free Exercise Clause. *See* ECF No. 31-3, ¶ 41 (Declaration of County of Santa Clara's Chief Operating Officer Miguel Márquez ("Marquez Decl.")) (*see also* Ex. 17, ¶ 41); Ex. 15 at 54:20-55:7; Ex. 18; Ex. 29 at 1; Ex. 27 at 51:22-54:18, 54:5-18. Therefore, there is no genuine dispute of material fact regarding Plaintiffs' *Monell* claim and the Court should grant summary judgment on this claim.

**C.      The County's Vaccine Policies And Orders, Including The Risk Tier System And Accommodation Processes, Violated The Free Exercise Clause**

The Free Exercise Clause provides that "Congress shall make no law . . . prohibiting the free exercise [of religion.]" U.S. Const. amend. I. The First Amendment specifically protects the exercise of sincerely held religious beliefs. *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S.Ct. 1719, 1723-24 (2018). Under the Free Exercise Clause, neutral laws of general applicability are subject to "rational basis" scrutiny if they only incidentally burden religious activity. *Emp. Div., Dep't of Hum. Res. of Oregon v. Smith*, 494 U.S. 872, 878 (1990). But, when burdensome laws are discriminatory against religious practices, i.e., not generally applicable, or neutral, strict scrutiny applies, and the government's actions must be both justified by a compelling interest and narrowly tailored to advance that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 553 (1990) ("*Lukumi*"). Here, the County's vaccination policies and orders, including the Risk Tier System and accommodation processes, were not neutral and generally applicable and fail strict scrutiny.

1.     *The County's Mandate, including the Risk Tier System, is not neutral and generally applicable because it burdens the Class's religious beliefs and creates a formal mechanism for determining risk level.*

"The principle that government, in pursuit of legitimate interests, cannot in a selective manner impose burdens only on conduct motivated by religious belief is essential to the protection of the rights guaranteed by the Free Exercise Clause." *Lukumi*, 508 U.S. at 531. Plaintiffs and Class members have sincere religious beliefs that prevent them from submitting to an injection of the COVID-19 vaccine, and the County's COVID-19 vaccination requirement put "substantial pressure" on Class members "to modify [their] behavior and to violate [their] beliefs." *Thomas v. Rev. Bd. of Indiana Emp. Sec. Div.*, 450 U.S. 707, 718 (1981). A classic case of substantial pressure occurs when a person must choose between their job and their religion. *Sherbert v. Verner*, 374 U.S. 398, 404 (1963). That is exactly the decision the County forced Class members to make – either "abandon[ ] one of the precepts of [their] religion" or abandon "[their] livelihood." *Id.* "While the compulsion may be indirect, the infringement upon free exercise is nonetheless substantial." *Thomas*, 450 U.S. at 718.

A strict scrutiny standard of review is appropriate here because the Risk Tier System involved "individualized governmental assessment," pursuant to which state actors were given "unfettered discretion" unrestricted by "particularized, objective criteria." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1082 (9th Cir. 2015); *see also Fulton v. City of Philadelphia*, 141 S. Ct. 1868 (2021). The Risk Tier System permitted department heads to determine the risk level of an employee's job *after* the employee sought a religious exemption from the vaccination mandate and to determine the risk level of a new position *after* an exempt employee applied for that position. Ex. 11 at 142:10-13; Ex. 21 at 17:5-17:15; Ex. 28 at 1; Davis Decl., ¶ 8; Baluyut Decl., ¶ 7. This policy is not neutral and generally applicable because it allows department heads to evaluate the risk level of a religiously exempt employee's position on an individualized basis. *See Dahl v. Bd. of Trustees of W. Michigan. Univ.*, 15 F.4th 728 (6th Cir. 2021) (finding that a university's COVID-19 vaccination policy was not neutral and generally applicable where the policy evaluated whether to grant religious exemptions on an individualized basis).

Moreover, the Department heads followed no particularized, objective, scientific or medical criteria in making these determinations. Ex. 15 at 50:4-19; Ex. 3 at 51:5-52:2. Rather, they relied on their own subjective beliefs and opinions regarding what constituted "high-risk." This resulted in the County classifying some religiously exempt employees as high-risk even though the employee's job required little to no interaction with the public or what the County considered "vulnerable" populations. Ex. 43, ¶ 3; Ex. 44, ¶ 3; Ex. 45, ¶ 4; Ex. 47, ¶ 4; Exs. 52-54; Davis Decl., ¶ 4. If an employee asked their department to reassess their position's assigned risk tier, the request was referred to the Department or County Counsel, not a medical professional or County executive, providing further opportunity for individualized assessment. Ex. 3 at 28:11-29:23, 51:5-52:2; Ex. 15 at 50:14-19; Ex. 14 at 2. Accordingly, the County's vaccination policies and orders, including the Risk Tier System, trigger strict scrutiny – a scrutiny these policies cannot survive.

> ### 2. The County's accommodation processes are not neutral and generally applicable because they favor employees with medical exemptions over religious exemptions.

A policy is not generally applicable where it "treat[s] *any* comparable secular activity more favorably than religious exercise." *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021) (emphasis in original) (citing *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020)). "[W]hether two activities are comparable for purposes of the Free Exercise Clause must be judged against the asserted government interest that justifies the regulation at issue." *Tandon,* 593 U.S. at 62 (citing *Roman Catholic Diocese of Brooklyn*, 592 U.S. at 17-18). Moreover, a law is not neutral when it is intolerant of religious beliefs or restricts practices because of their religious nature. Lukumi, 508 U.S. 520, 533 (1993). The County's accommodation processes "operate[] in practice" in a way that "target[s] religious practice…." *Stormans, Inc. v. Wiesman*, 794 F.3d 1064, 1076 (9th Cir. 2015) (quoting *Lukumi*, 508 U.S. at 535-37).

The County treated medically exempt employees in high-risk settings more favorably than religiously exempt employees in high-risk settings. Per the County's own admission, medically exempt employees were "entitled to priority consideration for placement in or selection for vacant positions as part of the accommodation process, consistent with disability law." Ex. 18 at 3. In practice, this resulted

in differing and more favorable accommodations processes for medically/disability exempt employees than religiously exempt employees.

Employees with medical/disability exemptions were referred to work with the EOD. Ex. 21 at 41:1-20; Ex. 23; Ex. 27 at 25:12-20. The EOD would assist medically exempt employees in identifying positions that would accommodate the employee's medical disability. *Id.* Once a vacancy was identified, the EOD would work with the Department to directly place the medically exempt employee into the identified position. Ex. 21 at 42:16-19, 47:22-48:10, 59:12-60:20; Ex. 25 at 1. The employee did not have to apply or compete for the position. Ex. 21 at 59:12-60:20. Additionally, the EOD signed off on various accommodations for unvaccinated medically exempt employees, including telework. Ex. 24 at 2; Ex. 21 at 55:9-57:25.

In contrast, employees with religious exemptions were referred to work with the ESA's VaxJobReview Team. Ex. 27 at 25:12-20; Ex. 32 at 3; Ex. 13 at 18:11-15; Ex. 14; Ex. 21 at 42:16-19; Ex. 23 at 1. This team only assisted religiously exempt employees in identifying open County positions. Ex. 27 at 36:14-38:14; Ex. 32 at 3; Ex. 14; Exs. 30-31. The employee would then apply for the position themselves and engage in the competitive recruitment process to obtain the position. Exs. 30-32 (outlining vaxjobreview process); Ex. 32 at 3 ("This still does not guarantee [religiously exempt employees] a job, they still have to be in the top 10 and be chose."). Religiously exempt employees did not know the risk tier of the position they were applying for until they applied for the new position. Ex. 28 at 1; Davis Decl., ¶ 8; Baluyut Decl., ¶ 7. Religiously exempt employees were not granted automatic placement/transfer, preferential treatment, or any alternative form of accommodation. Ex. 29 at 1; Ex. 13 at 27:11-20, 31:18-22; Ex. 18 at 3, ¶ 4. Giving preferential treatment to high-risk employees with medical exemptions for open County positions while requiring religiously exempt employees to compete on equal terms with all other applicants clearly lacks neutrality and general applicability and resulted in only 0.6% (3/461) of the Class obtaining new positions in the County, while 3.84% (2/52) of medically exempt employees were directly placed into new positions. Ex. 26 (identifying two unvaccinated, high-risk, medically exempt employees who were placed into positions and three unvaccinated, high-risk, religiously exempt employees who obtained new positions); Ex. 61

(identifying 52 employees with medical exemptions in high-risk settings); ECF No. 137, Ex. 1, ¶ 3 (461 Class members).

### 3. The County's policies and accommodations processes cannot satisfy strict scrutiny.

Because the County's vaccine Risk Tier System and accommodations processes are not neutral and generally applicable, they trigger strict scrutiny under the First Amendment. *See Fulton*, 141 S. Ct. at 1877; *Lukumi*, 508 U.S. at 531–32. On strict-scrutiny review, "only those interests of the highest order and those not otherwise served can over-balance legitimate claims to the free exercise of religion." *Bowen v. Roy*, 476 U.S. 693, 728 (1986) (O'Connor, J., concurring). Strict scrutiny also requires that a law inhibiting religious belief or practice go only as far as necessary to further the government interest. States cannot "justify an inroad on religious liberty" without first "showing that it is the least restrictive means of achieving some compelling state interest." *Thomas*, 450 U.S. at 718. The County cannot show that its Risk Tier System and its accommodation processes satisfy this standard.

**Risk Tier System.** At the time of the County's vaccine policies and orders, "[s]temming the spread of COVID-19 [wa]s unquestionably a compelling interest." *Roman Catholic Diocese of Brooklyn*, 592 U.S. at 18. However, based on the evidence available during the Class Period, taking away Plaintiffs' and Class members' livelihoods was not the least restrictive means of achieving that interest. Dr. Ram Duriseti testified that "the defendants at best provide selective favorable interpretations of incomplete and confounded data that supports their [vaccination policies and orders] while rejecting similar data widely available that undermine their claims." Ex. 34, ¶ 5. Data available in the fall of 2021 suggested that the primary benefit of vaccination was to the vaccine recipient. *Id.*, ¶ 8. Indeed, the vaccine trials were not even designed to test for preventing COVID-19 transmission. *Id.*, ¶ 9. Dr. Duriseti noted that at the very least, "those data points, which include the original FDA trial documents in late 2020, should have given scientifically literate, apolitical, and inquisitive health professionals pause in any enthusiasm they may have held for COVID-19 vaccine mandates in any risk tier." *Id.*, ¶ 94. Yet, without hesitation, the County used this incomplete data to create a Risk Tier System that "curtail[ed] [Class members'] free exercise of their rights and bodily autonomy." *Id.*, ¶ 5.

Notably, even scientific studies that supported vaccination and vaccination mandates did so with specific carve outs for religious and medical exemptions. Ex. 37 at 20:18-29:17; Exs. 39-42. The County

was aware that its response was more restrictive than State guidance and the policies of nearby counties, proving that more measured responses were available and utilized elsewhere. Ex. 3 at 21:7-30:18, 61:3-21, 122:7-123:21; Ex. 15 at 98:25-99:17.

Certainly, other less restrictive measures than loss of livelihood were available, including routine testing, masking, remote work, and social distancing. Dr. Sarah Rudman admitted that these measures are effective in reducing transmission of COVID-19. Ex. 3 at 84:8-87:1. Defendants fail to explain why these measures were not an option for the religiously exempt during the Class Period even though the County aggressively imposed these measures for the first 18 months of the pandemic and other counties were effectively utilizing them. Davis Decl., ¶ 6; Baluyut Decl., ¶ 5; Ramirez Decl., ¶ 5; Ex. 11 at 29:22-30:9. The County also failed to give any consideration to the effects of natural immunity, which "provides defenses against reinfection and transmission that a COVID-19 vaccination only generally does not." Ex. 34 at Exhibit 1, ¶ 5. Notably, the County permitted religiously exempt employees in low- and intermediate-risk settings to continue masking and testing without forcing them to surrender their livelihoods. Ex. 10 at 1; Ex. 58 at 12-13; Ex. 48 at 1.

The Risk Tier System also does not survive strict scrutiny because the risk tier classifications were arbitrary and irrational. The County allowed department heads to determine the risk tier of an employee's job with little to no scientific or medical guidance. Ex. 3 at 28:11-29:23, 45:8-23, 51:5-52:2; Ex. 15 at 50:4-19; 99:22-100:22; Ex. 14 at 2; Ex. 27 at 54:21-56:14. This resulted in the County classifying some religiously exempt employees as high-risk and placing them on indefinite unpaid leave even though the employee's job required little to no interaction with the public, patients or inmates. Ex. 43, ¶ 3; Ex. 44, ¶ 3; Ex. 45, ¶ 4; Ex. 47, ¶ 4; Exs. 52-54; Davis Decl., ¶ 4. The County cannot show how placing roofers and HVAC technicians on unpaid leave is narrowly tailored to stem the spread of COVID-19.

At a minimum, the Court should grant summary judgment for the period of March 7, 2022, to September 27, 2022—the second half of the Class Period. As of March 7, 2022, the County Health Officer permitted unvaccinated, exempt employees across Santa Clara County to return to work in higher-risk settings with masking and testing requirements. Ex. 17, ¶ 52; Ex. 4 at 75. Yet, the County Executive Office did not change its policy to permit its own unvaccinated, exempt personnel to return

to work. Ex. 3 at 78:21-84:1; Ex. 15 at 95:2-96:2; 97:9-99:17; Ex. 17 at 113. County executives are unable to articulate any rationale for why the County Health Officer permitted unvaccinated, exempt workers across Santa Clara County to return to work but did not permit their own unvaccinated employees to return to the workplace. Ex. 3 at 78:21-84:1; Ex. 15 at 95:2-96:2; 97:9-99:17; Ex. 17 at 113. "By requiring its own [exempt] employees to be vaccinated without accommodation" while permitting other unvaccinated, exempt workers within the County to return to work, the County's "application of the [vaccine policies and orders] failed to fully account for the issues that would undermine its interest" in stemming the spread of COVID-19. *Bacon v. Woodward*, 104 F.4th 744, 753 (9th Cir. 2024).

*Accommodation Processes.* Defendants also readily concede – and offer no compelling reason – that they granted those with medical and disability exemptions preferential consideration for – and priority transfers to – open County positions while stripping Plaintiffs and Class members of their employment benefits. *See* ECF 31-3, ¶ 41 (Marquez Decl.) (*see also* Ex. 17, ¶ 41); Ex. 15 at 54:20-55:7; Ex. 18; Ex. 29 at 1; Ex. 27 at 51:22-54:18, 54:5-18; Ex. 21 at 42:16-19, 59:12-60:20. Compliance with disability law is not a compelling interest for discriminating against religious beliefs. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 543 (2022) ("In no world may a government entity's concerns about phantom [legal] violations justify actual violations of an individual's First Amendment rights.").

Surely, Defendants could have imposed during the Class Period – and certainly in the latter half – less restrictive measures, like mandatory testing, masking, remote working, and social distancing – measures imposed during the height of the pandemic. Davis Decl., ¶ 6; Baluyut Decl., ¶ 5; Ramirez Decl., ¶ 5; Ex. 11 at 29:22-30:9. Instead, the County chose to treat religious objectors less favorably – forcing them to lose their livelihoods and then compete with other applicants for alternative County positions. Exs. 29-32; Davis Decl., ¶ 5; Baluyut Decl., ¶ 4; Ramirez Decl., ¶ 4; Ex. 13 at 27:11-20, 31:18-22; Ex. 18 at 3, ¶ 4. Accordingly, Plaintiffs are entitled to summary judgment on their Free Exercise Claim because the County's arbitrary and irrational application of its vaccine policies, including its Risk Tier System and accommodation processes, cannot survive strict scrutiny.

## VI. CONCLUSION

The County's COVID-19 vaccine policies and orders violated constitutional and statutory protections. Therefore, Class members are entitled to partial summary judgment on their Title VII, FEHA, *Monell,* and Free Exercise Clause claims.

Respectfully submitted,

DATED:  July 11, 2024                                **ADVOCATES FOR FAITH & FREEDOM**

                                                              */s/ Bethany Onishenko*
                                                              Bethany Onishenko, Esq.

                                                              Robert H. Tyler, Esq.
                                                              Bethany Onishenko, Esq.
                                                              25026 Las Brisas Road
                                                              Murrieta, California 92562
                                                              Telephone:     (951) 600-2733

                                                              Rachele R. Byrd
                                                              **WOLF HALDENSTEIN ADLER**
                                                                **FREEMAN & HERZ LLP**
                                                              750 B Street, Suite 1820
                                                              San Diego, CA  92101
                                                              Telephone:     (619) 239-4599
                                                              *Class Counsel*